## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA and STATE OF NEW JERSEY,

     *Plaintiffs*,

     v.

DONALD J. TRUMP, *in his official capacity as President of the United States*; ROBERT F. KENNEDY, JR., *in his official capacity as Secretary of Health and Human Services*; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES; SCOTT BESSENT, *in his official capacity as Secretary of the Treasury*; UNITED STATES DEPARTMENT OF THE TREASURY; LORI CHAVEZ-DeREMER, *in her official capacity as Secretary of Labor*; UNITED STATES DEPARTMENT OF LABOR; and UNITED STATES OF AMERICA,

     *Defendants*,

LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME,

     *Intervenor-Defendant*.

No. 2:17-cv-04540-WB

**REPLY IN SUPPORT OF INTERVENOR-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ...............................................................................................1

ARGUMENT ......................................................................................................2

    I.   The States lack Article III standing. ....................................................2

        A.  The States have no Article III injury..........................................2

        B.  The States cannot show redressability. ........................................3

    II. The Mandate itself violates the nondelegation doctrine.......................4

    III. HRSA did not have the authority to issue the Mandate under the
         Appointments Clause. ........................................................................6

    IV. The Mandate is unconstitutional under the First Amendment as
         applied to religious objectors. ............................................................9

    V.  Under *Little Sisters*, the Final Rule does not violate the APA..........12

        A.  The Final Rule is permitted by RFRA. .....................................12

        B.  The Final Rule is required by RFRA. ........................................13

        C.  The Final Rule contains a sufficient explanation of its findings. ...............15

        D.  The agencies considered reasonable alternatives.........................16

        E.  The Final Rule is not overbroad.................................................17

        F.  The Final Rule is severable.........................................................19

CONCLUSION...................................................................................................20

CERTIFICATE OF SERVICE ...........................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Braidwood Mgmt., Inc. v. Becerra*,
104 F.4th 930 (5th Cir. 2024) ...............................................................8

*Brockett v. Spokane Arcades, Inc.*,
472 U.S. 491 (1985) ...........................................................................19

*Burwell v. Hobby Lobby Stores, Inc.*,
573 U.S. 682 (2014) .......................................................................14, 18

*Catholic Charities Bureau, Inc. v. Wis. Lab. & Indus. Rev. Comm'n*,
145 S. Ct. 1583 (2025) ....................................................................10-11

*Commonwealth of Pennsylvania v. President*,
888 F.3d 52 (3d Cir. 2018) ..................................................................14

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) .............................................................................5

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ...........................................................................12

*Fulton v. City of Philadelphia*,
593 U.S. 522 (2021) .............................................................................9

*Geneva Coll. v. HHS*,
778 F.3d 422 (3d Cir. 2015) ..................................................................1

*Green Island Power Auth. v. FERC*,
577 F.3d 148 (2d Cir. 2009) ................................................................15

*Greenberg v. Lehocky*,
81 F.4th 376 (3d Cir. 2023) ...................................................................2

*Hartnett v. Pa. State Education Ass'n*,
963 F.3d 301 (3d Cir. 2020) ...................................................................2

*Kajmowicz v. Whitaker*,
42 F.4th 138 (3d Cir. 2022) ...................................................................8

*Kennedy v. Braidwood Management, Inc.*,
No. 24-316, 2025 WL 1773628 (June 27, 2025) ...................................7, 8

*Little Sisters v. Pennsylvania*,
  591 U.S. 657 (2020)..........................................................*passim*

*Lofstad v. Raimondo*,
  117 F.4th 493 (3d Cir. 2024) .................................................7

*Lucia v. SEC*,
  585 U.S. 237 (2018)..........................................................6, 7

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..........................................................2-3

*Massachusetts v. HHS*,
  513 F. Supp. 3d 215 (D. Mass. 2021) .........................................16

*Mayor of Baltimore v. Azar*,
  973 F.3d 258 (4th Cir. 2020) .................................................16

*Mistretta v. United States*,
  488 U.S. 361 (1989)............................................................5

*Nat'l Org. for Women, Inc. v. Scheidler*,
  510 U.S. 249 (1994)............................................................2

*Pa. Prison Soc'y v. Cortés*,
  508 F.3d 156 (3d Cir. 2007)...................................................3

*Panama Refining Co. v. Ryan*,
  293 U.S. 388 (1935)............................................................5

*Spivack v. City of Philadelphia*,
  109 F.4th 158 (3d Cir. 2024) .................................................10

*Tandon v. Newsom*,
  593 U.S. 61 (2021)............................................................10

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)..........................................................2-3

*Yeboah v. U.S. Dep't of Justice*,
  345 F.3d 216 (3d Cir. 2004)..................................................17

**Statutes**

42 U.S.C. § 300gg-13 .........................................................6-7

**Other Authorities**

45 C.F.R. § 147.132 .....................................................17, 18, 19

45 C.F.R. § 147.133 ..............................................................................................................19

47 Fed. Reg. 38,409 (Aug. 31, 1982)....................................................................................8

78 Fed. Reg. 39,870 (July 2, 2013) ......................................................................................11

## INTRODUCTION

The States' remaining arguments require this Court to hold that there is no rational explanation for the Final Rule. But that position ignores the Supreme Court's 7-2 rejection of the States' core claims, as well as the Court's findings that:

- the Final Rule is authorized by a "capacious grant of authority" from Congress;

- the Court had "directed the Government to 'accommodat[e] … religious exercise;'"

- even if the Final Rule caused third-party harm, "it is Congress, not the Departments, that has failed to provide the protection for contraceptive coverage;"

- and the agencies had "explained [their] position in fulsome detail" in the Final Rule.

The States instead press arguments that even if correct, would not change the outcome of the Final Rule. They also fail to show that they will be harmed by a Rule that has now been in place for years, or how this Court could redress their problem, given the ongoing injunctions against the Mandate and the obvious unconstitutionality of the relief they request. How could this Court issue a lawful ruling to help them? The States never say.

Nor do the States disclaim their prior admission that the "accommodation" would "facilit[ate] access to" contraception. ECF No. 261 at 17. That admission effectively concedes the RFRA argument, which the States had previously dodged only by relying on the stale understanding that the religious objector "in no way" "facilitate[s]" "the provision of contraceptive coverage." *Geneva Coll. v. HHS*, 778 F.3d 422, 438 (3d Cir. 2015). Now that the parties agree on that crucial fact, there can be no serious dispute about whether the "accommodation" imposes a substantial burden, and thus whether RFRA required the Final Rule.

That is enough to end the case. And ending the case here will spare the entire contraceptive mandate from being invalidated on nondelegation, Appointments Clause, and First Amendment grounds the States cannot rebut. It is time for the contraceptive mandate litigation to end.

## ARGUMENT

### I. The States lack Article III standing.

#### A. The States have no Article III injury.

The States' central response on standing underscores how they fail to reckon with *Little Sisters*. The States claim the Little Sisters' standing arguments were "rejected" by prior rulings, Opp. 19, but those decisions have been "reverse[d]," *Little Sisters v. Pennsylvania*, 591 U.S. 657, 687 (2020). Even if they had not, the States would still lack standing at this stage of the litigation. The States wrongly suggest that standing can be challenged only at the outset of a case. *See* Opp. 19-20.[1] As the Third Circuit and Supreme Court have recently and repeatedly explained, "[s]tanding is a 'jurisdictional requirement' that 'remains open to review at all stages of the litigation.'" *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994)). Moreover, "[a] plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). This means that even if the States initially had standing based on the predicted injuries they alleged at the pleading stage, now that we are at summary judgment, "the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced'"

---

[1]    *Hartnett v. Pennsylvania State Education Association* simply draws a distinction between standing and mootness. 963 F.3d 301, 305 (3d Cir. 2020) It does not stand for the proposition that standing can be challenged only once or that a plaintiff does not need to prove the facts it alleges to establish standing at summary judgment.

to that point. *Id.* (quoting *Lujan*, 504 U.S. at 561). And the States offer no evidence that, in the five years the Final Rule has been in effect, any of the injuries they anticipated have actually materialized.

Ruling against the States on standing does not require the Court to disclaim its prior holding that the States previously showed "more than a mere possibility" of injury prior to the Final Rule taking effect. ECF No. 136 at 14. It requires only observing that the possibility has not come to pass. With the Final Rule in effect since 2020, the States' failure to offer evidence showing that *anyone* has lost coverage due to the Final Rule is fatal on summary judgment, where they "bear[ ] the burden of proof" to support their claims with "specific facts" in evidence. *Pa. Prison Soc'y v. Cortés*, 508 F.3d 156, 161 (3d Cir. 2007); Br. 8-9.

Furthermore, *Little Sisters* confirms that the agencies had the power to accommodate sincere religious objectors. And the States make no response to the point that standing for any overbreadth claim must be supported by a claim of actual harm from that overbreadth, conceding the point. Br. 9-10. Rather, the States attempt to flip their burden to the agencies, arguing, for example, that the *absence* of evidence that any for-profits with shareholders object to the Mandate dooms the Final Rule. *See* Opp. 5. But the utter *absence* of such proof is an insurmountable standing problem for the States before it could be a merits problem for the agencies as to that particular piece of the Final Rule.

### B.  The States cannot show redressability.

Even if the States could show a genuine injury, that injury could not be redressed by vacating the Final Rules. First, the States ignore injunctions entered on behalf of open groups of religious objectors that would protect entities subject to the Mandate, including after the Final Rule's impact analysis. ECF No. 206-1 at 7-9 nn. 3-5; *e.g.*, Order, *Christian Emps. All.* v. *Azar*, No. 3:16-cv-309 (D.N.D. May 15, 2019), Dkt. 53 (granting permanent injunction to current and future members of

Christian Employers Alliance). To the extent there are religious objectors who will be subject to the Mandate if the Final Rules disappear, then the Court must contend with the multiple Constitutional problems that would resurface with the underlying Mandate, including violations of the Free Exercise Clause, the Establishment Clause, the non-delegation doctrine, and the Appointments Clause. Br. 12-20. The States do not explain how this Court could order the Agencies to reinstate the Mandate in a manner consistent with the Constitution.

The States also assert that their failure to challenge the exemptions in the HRSA Guidelines themselves does not matter to redressability, because "[e]xemptions from the Guidelines always have been the work of the Agencies, not HRSA." Opp. 22. That is wrong. The Supreme Court held that "the ACA leaves the Guidelines' content to the *exclusive discretion of HRSA*" including "broad discretion" to create "religious … exemptions." *Little Sisters*, 591 U.S. at 677 (emphasis added). Acknowledging the agencies' separate power to add exceptions does not change the Supreme Court's clear language on this point. *See id.* at 676 (HRSA can "identify and create exemptions from its own Guidelines."). Particularly where the States rely on the HRSA Guidelines having independent force—since the Guidelines are the only place the Mandate's required contraceptives are listed—they cannot disclaim that power contrary to a clear Supreme Court ruling.

## II. The Mandate itself violates the nondelegation doctrine.

Contrary to the States' view, the Supreme Court didn't seem to think the nondelegation doctrine was "well beyond the scope of this case." Opp. 23. Rather, the Court simply pointed out the issue had not yet been "pressed." *Little Sisters*, 591 U.S. at 679. That was no problem for the Court at the time, because it was rejecting the States' and the dissent's argument to use the statute to force contraceptive coverage. *Id.* Rather, at that stage, it was enough to point to HRSA's

"virtually unbridled" and "exclusive" discretion, and to note that the religious exemption was permissible. *Little Sisters*, 591 U.S. at 676, 677.[2]

Now, however, the States ask this Court to go further, and to force the agencies to use Congress's expansive grant of authority to require contraceptive coverage. Anything less would not redress their claimed harm. At this stage, it is not only proper but necessary to accept the Supreme Court's invitation to consider whether the underlying statute the States wish to deploy is valid—and thus could be imposed by this Court to provide the redress the States seek. If that relief cannot be implemented because the underlying law is invalid, the Final Rules must be upheld. On that score, the States do not engage the caselaw holding that Congress must *both* "clearly delineate[ ] the general policy … *and* the boundaries of this delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989) (emphasis added). The States pretend that "intelligible principle" refers only to boundaries: that confining HRSA's otherwise unbridled discretion to services that are "preventive," "for women," and not redundant with another mandate is sufficient. Opp. 24. But in *Panama Refining Co. v. Ryan*, the President was likewise working within narrow boundaries: he could only regulate "petroleum," and then only its "interstate and foreign" transportation, and then only that "produced or withdrawn" beyond that "permitted by state authority." 293 U.S. 388, 415 (1935). Yet the Supreme Court held that even a "defined," circumscribed authority violates the nondelegation doctrine where Congress has "declare[d] no policy" to guide the policy choices *within* that authority. *Id.* at 414-15.

---

[2]    The States claim, without real explanation, that the Little Sisters should not be permitted to raise this argument, even in district court. Opp. 23-24. Permission to defend a regulation against a legal challenge logically includes permission to raise standing defects with that challenge, and to ensure that the legal regime that would result from the challenge is constitutional. And this Court has a continuing "obligation to assure" itself of standing after the Supreme Court's comments. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006).

Here, the *Little Sisters* Court found HRSA was granted "virtually unbridled discretion" within its scope of authority, and that Congress was "completely silent" as to "any criteria or standards," declining to even provide an "illustrative" list. 591 U.S. at 676.[3] That lacks an intelligible principle in the precise language ("unbridled discretion") of the doctrine, and it forecloses the States' request here. Br. 12-14.

**III. HRSA did not have the authority to issue the Mandate under the Appointments Clause.**

Similarly, the Mandate is unenforceable because the "continuing office" of the HRSA Administrator exercises "significant discretion" when carrying out "important functions" of government. *See Lucia v. SEC*, 585 U.S. 237, 247-48 (2018) (internal quotation marks omitted). He is thus subject to the Appointments Clause and may not exercise those functions absent Senate confirmation or a congressional exception under Article II, Section 2. Br. 14-16. Each of the States' arguments to the contrary fails.

The States' lead response again requires ignoring *Little Sisters*' extensive discussion of HRSA's "virtually unbridled discretion" by insisting its Guidelines have "no independent force." Opp. 24. But the HRSA Guidelines must have independent force. The mandated services are nowhere to be found in the CFR—they are determined only by HRSA. Furthermore, HRSA's guidelines can become effective immediately. They are not subject to a one year "minimum interval" waiting period like other recommendations by the Task Force, the Advisory Committee on Immunization Practices, or the HRSA guidelines relating to children. *See* 42 U.S.C. § 300gg-

---

[3]   The States cite the Supreme Court's denial of certiorari on the non-delegation claim in *Braidwood Mgmt., Inc. v. Becerra*, 145 S. Ct. 1053 (Jan. 13, 2025); Opp. 24 n.14. But the claim in the denied petition challenged all four provisions of 42 U.S.C. § 300gg-13(a). This case raises only one of those provisions, the one governing HRSA and coverage for women's services, § 300gg-13(a)(4)—the very provision the Supreme Court said "grants sweeping authority to HRSA." *Little Sisters*, 591 U.S. at 676.

13(b) (setting minimum interval for Task Force, ACIP, and HRSA guidelines for children); 42

U.S.C. § 300gg-13(a)(4) (HRSA guidelines for women).[4] And if the States are arguing that the

agencies can somehow override HRSA by "defin[ing]" "compliance" with the Guidelines in a way

that permits exemptions, Opp. 24, that is no distinction from *Lucia*. There, the fact that the relevant

officers' decisions bound no one until the SEC "issue[d] an order" did not undercut their discretion.

*Lucia*, 585 U.S. at 249. Further, unlike the council in *Lofstad v. Raimondo* who enjoyed only the

"mere power to propose" recommendations (subject to specific criteria, no less), 117 F.4th 493,

500 (3d Cir. 2024), the HRSA Administrator enjoys "sweeping authority … to craft a set of

standards … [and] decide what counts as preventive care and screening[]," and the "ability to

identify and create exemptions from its own Guidelines." *Little Sisters*, 591 U.S at 676. This

authority makes the HRSA Administrator an officer under *Lucia* who has never undergone Senate

confirmation.

The States attempt to resolve this issue with a patchwork of statutes and regulations to argue

that Congress vested the appointment of the HRSA Administrator in the HHS Secretary. Opp. 25.

But vague language about the Secretary's authority pieced together from disparate sources—none

of which mentions the appointment power—cannot replace the "exclusive discretion" the Supreme

---

[4]    This waiting period distinguishes the HRSA Administrator's powers from those of the Task
Force members addressed in *Kennedy v. Braidwood Management, Inc.*, No. 24-316, 2025 WL
1773628 (June 27, 2025). This minimum-interval period for Task Force recommendations was
considered a "strong indication" that the Task Force members are inferior officers. *Id.* at *10. The
Court held the interval gives the Secretary "plenty of time" to "block a Task Force
recommendation." *Id.* As the Court put it, the ACA "expressly affords the Secretary the power" to
create such a waiting period, during which the Secretary has a host of options for blocking a
recommendation including, "request that the Task Force reconsider or withdraw a
recommendation," "remove and replace" members, or even request modification or rescission of
the recommendation. *Id.* No such power is given to the Secretary for HRSA's guidelines for
women. *See* 42 U.S.C. § 300gg-13(b) (setting minimum interval for other recommendations and
guidelines).

Court has already found the ACA's "plain language" provides HRSA. *Little Sisters*, 591 U.S. at 677, 679 ("By its terms, the ACA leaves the Guidelines' content to the exclusive discretion of HRSA."). The States' vesting argument also fails because the States nowhere show that the Secretary actually makes this appointment. *Cf. Braidwood*, 2025 WL 1773628, at *17 ("Congress has, in two steps, expressly vested the Secretary of HHS with the authority to appoint Task Force members.").

The States' final argument is weaker still: that a ratification memo by the HHS Secretary "effectively cures" these Appointments Clause problems. Opp. 25; J.A. at 34-35, *Braidwood*, No. 24-316 (U.S. filed Feb. 18, 2025) (Memorandum from Xavier Becerra, Sec'y of Health & Hum. Servs. (Jan. 21, 2022)). Not so. For the memo to cure any serious defect, the HHS Secretary must "(1) at the time of the ratification have the authority to take the action to be ratified, (2) have full knowledge of the decision to be ratified, and (3) make a detached and considered affirmation of the earlier decision." *Kajmowicz v. Whitaker*, 42 F.4th 138, 147-48 (3d Cir. 2022) (cleaned up).[5] But the Secretary fails to meet even the first criterion: At the time of the January 2022 memo, issuing comprehensive guidelines for women's preventative care and screenings was a responsibility tasked to the HRSA Administrator alone. *See Little Sisters*, 591 U.S. at 677; *see also* 47 Fed. Reg. 38,409, 38,410 (Aug. 31, 1982) (HRSA "is directed by [the] Administrator" in all its duties).

---

[5]   This is assuming the memo passes muster under the APA, an open question in ongoing litigation. *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 956 (5th Cir. 2024), *cert. granted sub nom. Becerra v. Braidwood Mgmt., Inc.*, 145 S. Ct. 1038 (Jan. 10, 2025), and *cert. denied*, 145 S. Ct. 1053 (Jan. 13, 2025) (considering "serious APA problems with the Secretary's ratification memo" and remanding the question to the district court in the first instance).

All told, the HRSA Administrator cannot act as an officer without proper appointment under Article II because he was not confirmed by the Senate. The Mandate therefore cannot lawfully be enforced.

**IV. The Mandate is unconstitutional under the First Amendment as applied to religious objectors.**

The Little Sisters previously explained that if the Final Rule is struck down, the underlying Mandate cannot be re-implemented because it violates the Religion Clauses of the First Amendment. Br. 16-20. That's because the Mandate permits individualized and categorical exemptions and therefore fails the Free Exercise Clause's requirement of general applicability. Br. 16-18. The Mandate also independently violates the Free Exercise Clause and the Establishment Clause under the church autonomy doctrine by exempting some religious organizations but not others based on (1) protected matters of internal governance and (2) the perceived religiosity of different groups. Br. 18-20.

The States assert that the Mandate does not run afoul of *Fulton* because if the Final Rules are vacated, there would be no system of discretionary exceptions. Opp. 26. That's plainly wrong. The Supreme Court noted that "HRSA has virtually unbridled discretion to decide what counts as preventive care," including its "ability to identify and create exemptions from its own Guidelines." *Little Sisters*, 591 U.S. at 676. Thus, even if no exceptions existed, HRSA retains the discretion to create them, which alone triggers strict scrutiny. *See Fulton v. City of Philadelphia*, 593 U.S. 522, 537 (2021) (discretion triggers strict scrutiny "regardless whether any exceptions have been given"). But this is an even easier case than *Fulton* because HRSA has already exercised its discretion numerous times to create exceptions—therefore rendering its policies not generally applicable.

The Mandate also violates the Free Exercise Clause because it permits categorical exceptions for secular conduct, thereby treating comparable secular activity more favorably than religious exercise. Br. 17-18. The States argue that these exceptions, including grandfathered health plans, are "wholly unrelated to religious status" and therefore not comparable. Opp. 26. But that misunderstands the relevant inquiry. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the *asserted government interest* that justifies the regulation at issue." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (emphasis added). Here, the grandfathered health plans and the Final Rule are comparable: the government's asserted interest in the Mandate is facilitating contraceptive access and grandfathered health plans undermine that interest in the same way the Final Rule does. *Spivack v. City of Philadelphia*, 109 F.4th 158, 177 (3d Cir. 2024) ("When the government says that it cannot exempt religious exercise from a policy because doing so would undermine an important interest, but then exempts other groups or actions that undermine that same interest in the same way, its arbitrary distinction between religious and secular behavior raises an inference that it has targeted religious practice for distinctive treatment."). That the "[grandfathered] exemption is generally applicable" because it applies to religious and secular employers is irrelevant, Opp. 26, and indeed, the Supreme Court rejected that very argument in *Tandon,* 593 U.S. at 63; *see id.* at 65 (Kagan, J., dissenting). In any event, the question is whether the *Mandate* is generally applicable. It isn't, as the grandfathered health plan exemption proves.

Finally, the States offer no response to the Little Sisters' church autonomy argument, instead requesting that this Court order supplemental briefing after the Supreme Court's decision in *Catholic Charities Bureau, Inc. v. Wisconsin Labor & Industry Review Commission*, 145 S. Ct.

1583 (2025). Opp. 27 n.16. The Court's decision has now come down and establishes that the Mandate is unconstitutional.

In *Catholic Charities,* Wisconsin provided an exemption from its unemployment compensation program for "nonprofits 'operated primarily for religious purposes.'" 145 S. Ct. at 1587. The Wisconsin Supreme Court found that Catholic Charities Bureau did not qualify for the religious exemption because it "neither engage[s] in proselytization nor serve[s] only Catholics." *Id*. The U.S. Supreme Court unanimously reversed, holding that this ruling violated the principle under the Establishment Clause and the Free Exercise Clause "that the government may not 'officially prefe[r]' one religious denomination over another." *Id.* at 1591. That's because "eligibility for the exemption ultimately turns on inherently religious choices (namely, whether to proselytize or serve only co-religionists)." *Id*. at 1592.

Here, the Mandate similarly discriminates along theological lines. It exempts "churches, their integrated auxiliaries, and conventions or associations of churches," as well as "*the exclusively religious activities* of any religious order." 78 Fed. Reg. 39,870, 39,874 (July 2, 2013) (emphasis added). But it doesn't exempt religious orders that, because of their faith, engage in activities the government deems not "exclusively religious," such as serving the elderly poor. After *Catholic Charities*, there is no doubt that these types of distinctions violate the Religion Clauses because "[d]ecisions about whether to 'express and inculcate religious doctrine' … when performing charitable work are … fundamentally theological choices driven by … different religious doctrines." *Catholic Charities*, 145 S. Ct. at 1593. The Mandate is thus unconstitutional and cannot lawfully be re-imposed by this Court.

**V. Under *Little Sisters*, the Final Rule does not violate the APA.**

**A. The Final Rule is permitted by RFRA.**

The States do not contest that the agencies were permitted to "exercise their rulemaking discretion to resolve RFRA violations" in the Final Rule. Opp. 7. Instead, they argue that this Court should strike the Final Rule as arbitrary and capricious if it disagrees with the agencies about whether there was a RFRA violation at all. *Id.*

The agencies were not working from a clean slate when they adopted the Final Rule. After they had altered the Mandate multiple times, and at each iteration received numerous comments asking for a broader religious exemption than they had provided, *Little Sisters*, 591 U.S. at 664-72, after they had been enjoined from enforcing the Mandate against dozens of religious objectors, Br. 4-5, and after the agencies were "directed" *by the Supreme Court* "to 'accommodat[e]' … religious exercise," *Little Sisters*, 591 U.S. at 677 n.7—presumably in a way that they had not already done so, there were many "adequate reasons" for the Final Rule, *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). Indeed, the Supreme Court's order in *Zubik* overrides the notion that there is no need to "remedy" any "RFRA conflicts," Opp. 7, and *Little Sisters* affirmed as much, 591 U.S. at 682. But even if the agencies had *not* been ordered by the Supreme Court to accommodate religious exercise, removing a burden on religious exercise in consideration of RFRA would not be arbitrary and capricious. This would be true even if this Court disagreed about "what violates RFRA." Opp. 7. To hold otherwise would be to put the agencies in a Catch-22, whereby they would be "susceptible to claims that the rules were arbitrary and capricious" if they did *not* attempt to relieve burdens on religious exercise, and they would be vulnerable to claims like the States' if they did. *Little Sisters*, 591 U.S. at 682.

Next, admitting that there *is* some problem, the States argue that the potential alleged loss of contraceptive coverage for employees means that any "disconnect" between that problem and the

Final Rule renders the exemption arbitrary and capricious. *See* Opp. 3. To begin with, the States have not brought any evidence that such a disconnect exists. *See* Br. 8-10; *supra* Part I. But even if it does, the States have not grappled with the Supreme Court's reasoning that any third-party harms are the fault of the statute here, not the agencies. *Little Sisters*, 591 U.S. at 679 ("it is Congress, not the Departments, that has failed to provide the protection for contraceptive coverage"). That is particularly true where, as here, Congress also allowed for that same disconnect by providing for secular exemptions from the rule. *See* Br. 30-31.

### B.  The Final Rule is required by RFRA.

The Little Sisters have explained that the Final Rule was necessary to comply with RFRA because the accommodation imposed a substantial burden and violated RFRA. Br. 25-32. The States largely decline to respond to the Little Sisters' arguments on this front, and they fail entirely to contest the Little Sisters' arguments that the Mandate cannot survive strict scrutiny. Br. 30-32.

The States cannot—and do not even try to—deny that accommodation coverage comes from the employer's health plan, that a touted *benefit* of the "accommodation" system was precisely that women would *not* have two separate plans, or that the coverage depends on issuance of a plan instrument under the employer's plan. *See* Br. 27-30; Suppl. Br. for Resp'ts, *Zubik v. Burwell*, 578 U.S. 403 (2016) (No. 14-1418), 2016 WL 1445915, at *17 ("There is *no mechanism* for requiring TPAs to provide separate contraceptive coverage *without a plan instrument*; *self-insured employers could not opt out of the contraceptive-coverage requirement by simply informing their TPAs that they do not want to provide coverage for contraceptives*.") (emphasis added). The States also fail to dispute the Little Sisters' factual assertions that the Mandate requires them to take

13

actions that violate their beliefs.[6] Instead, they continue to insist that the accommodation does not "trigger" provision of contraceptives. Opp. 8. This attempts to revive the argument *Hobby Lobby* and *Little Sisters* foreclosed—that a burden is measured by how "attenuated" is "the connection between what the objecting parties must do … and the end that they find to be morally wrong." *Little Sisters*, 591 U.S. at 681 (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 723 (2014)). But, as *Hobby Lobby* explained, the "attenuation" argument goes to a "question that the federal courts have no business addressing (whether the religious belief asserted in a RFRA case is reasonable)," not whether the mandate imposes a substantial burden. *Hobby Lobby*, 573 U.S. at 724.

More importantly, the States have admitted that compliance with the accommodation "facilit[ates] access to" contraceptive coverage, and that without the involvement of the employers, the coverage won't be provided. ECF No. 261 at 17. That, of course, is what religious objectors have always understood and what *Geneva College* misunderstood based on incorrect facts. Now that all parties agree that the forced involvement of religious objectors *is* directly involved in providing contraceptive coverage, the States have effectively conceded substantial burden. *Accord Little Sisters*, 591 U.S. at 707-08 ("The Little Sisters, among others, maintained that the accommodation itself made them complicit in providing contraception. The measure thus failed to 'assuage[ ]' their 'sincere religious objections.'") (Kagan, J., concurring).

---

[6]    For unclear reasons, the States point out that the Little Sisters did not have "to take any steps to comply" with the Mandate while the Final Rule was enjoined because the Little Sisters' benefit provider, Christian Brothers Employee Benefit Trust, is protected by an injunction in another lawsuit. Opp. 3-4 n.3. But the Third Circuit and the Supreme Court have both affirmed the Little Sisters' stake in this litigation. *Commonwealth of Pennsylvania v. President*, 888 F.3d 52, 60 (3d Cir. 2018); *Little Sisters*, 591 U.S. at 674 n.6. And the injunction protecting Christian Brothers only supports the Little Sisters' argument that the States' claimed injury is not redressable by invalidating the Final Rules.

Instead of addressing the Mandate's merits under RFRA, the States return continuously to *Real Alternatives*. But they do not acknowledge the Little Sisters' point that *Real Alternatives* dealt with a different religious belief than the Final Rule purports to address, Br. 28, or that *Real Alternatives* relied on incorrect facts, Br. 27-29. The Final Rule was thus required by RFRA to avoid the substantial burden of forcing religious objectors to facilitate access to contraceptives in violation of their undisputed religious beliefs.

**C. The Final Rule contains a sufficient explanation of its findings.**

The above arguments demonstrate that the States' arbitrary and capricious arguments—delving even into the details of the Final Rule's regulatory impact estimates—are misplaced. *See* Opp. 17-19. The thrust of the Final Rule is fundamentally that the prior accommodation triggered, and failed, RFRA's strict scrutiny analysis. The States make much of the fact that the Supreme Court did not rule that the Final Rule was required by RFRA or that it was not arbitrary and capricious. But they fail to grapple with the Supreme Court's reasoning, which leaves little doubt that it is not arbitrary and capricious to "simply reach[ ] a different conclusion" about the accommodation under RFRA. *Little Sisters*, 591 U.S. at 682 n.12.

The Little Sisters and the agencies have explained why the States are incorrect about the Final Rule's insufficiency even aside from RFRA, explanations the States attempt to sidestep. Br. 32-41; Fed. Def. Br. 18-37. Nevertheless, none of the States' complaints bear on the Final Rule's necessity. Opp. 9-10. And any error is harmless because "the outcome of the administrative proceedings" could not be changed by further explanation, a different regulatory impact estimate, or better consideration of comments. *See Green Island Power Auth. v. FERC*, 577 F.3d 148, 165 (2d Cir. 2009). That outcome is determined by RFRA and approved by *Little Sisters*. Br. 25-29.

The States argue that the release of the administrative record should change this Court's analysis of whether the agencies sufficiently considered comments, but this Court reviewed the

agencies' responses to comments regarding "scientific evidence of the harm to the health and economic security of women," "comments that assert the broad religious and moral exemptions will cause women to lose contraceptive coverage," comments that the exemption will "create barriers to medical care ... and, specifically, a comment submitted by various States ... regarding the medical risks associated with pregnancy." ECF No. 136 at 26. The States have supplied no comments at this stage that address new issues beyond those this Court already considered. Furthermore, since this Court has already held that the agencies met the "not 'particularly demanding'" test of "consider[ing] and respond[ing] to significant comments," the States' invocation of *Mayor of Baltimore v. Azar* is unavailing, because there the regulation "merely stated that it 'disagree[d]'" with the comments. 973 F.3d 258, 277 (4th Cir. 2020); ECF No. 136 at 26-27. *Ohio v. EPA*, 603 U.S. 279 (2024), is similarly unhelpful. There, EPA introduced a severability provision demonstrating that "EPA was aware of the applicants' concern," but it did not provide an explanation to address the concerns raised. *Id.* at 295. In contrast here, as *Little Sisters* already found, the agencies "explained [their] position in fulsome detail." 591 U.S. at 684.

**D**. **The agencies considered reasonable alternatives.**

The States continue to insist that the agencies ignored reasonable and obvious alternatives. *See* Opp. 11-13. In reality, the agencies "fulfilled their obligation by properly considering a number of reasonable alternatives and offering an explanation for why they were rejected." *Massachusetts v. HHS*, 513 F. Supp. 3d 215, 225 (D. Mass. 2021). The States simply don't like the explanations that the agencies provided. But that does not change the fact that the agencies considered and rejected each of the States' proposed alternatives with a sufficient explanation supporting their decision. *See* Br. 36-38; Fed. Def. Br. 25-31.

The States also mischaracterize the Little Sisters' arguments, claiming that the Little Sisters contend that "the Agencies did not have to consider reasonable alternatives" because other laws

16

make contraceptives available to women. Opp. 14. The Little Sisters make no such argument. Rather, the Little Sisters pointed out in their prior brief that the existence of other options for contraceptive access were part of the agencies' reasoned consideration and rejection of the alternatives the States now propose. *See* Br. 37-38. The States offer no genuine response to this point. And their "concerns" that laws like Title X are an incomplete solution, Opp. 14-15, again speak only to their disagreement with the agencies' conclusion, not to any failure to consider reasonable alternatives. "An action will not be deemed arbitrary, capricious, or an abuse of discretion simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available." *Yeboah v. U.S. Dep't of Justice*, 345 F.3d 216, 223 (3d Cir. 2004) (cleaned up)).

### E. The Final Rule is not overbroad.

As the Little Sisters have already explained, the Final Rule exempts entities only "to the extent of [their] objections." 45 C.F.R. § 147.132(a)(1); *see id.* (a)(2). For that reason, an entity that objects only to "some, but not all, contraceptive items" are not exempt from maintaining a plan "with respect to the items to which they do not object." J.A. 23. Likewise, an entity that objects to compliance with the Mandate as originally designed, but not to compliance via the accommodation, would not be excused from compliance altogether.

The States have no answer for the "to the extent" language. And indeed, their claim of overbreadth falls apart without it: "optional for entities that are otherwise also eligible for the expanded exemptions" by its terms does not mean optional for entities that are *not* exempt from compliance by the available means. Opp. 4 (quoting J.A. 34). And the States likewise do not address the possibility of reluctant users of the accommodation. Br. 42-43. Rather, they continue to assume without explanation that any entity that used the accommodation (rather than filing suit) must be content with that option as a religious matter. Opp. 3-4. But the agencies' stating that

"some" accommodated entities "may" switch to the exemption while "others might not," is perfectly consistent with an understanding that some entities may have complied under compulsion despite their sincere beliefs. J.A. 42.

The States' other concern that the Final Rule reaches "beyond RFRA violations" because the exemption is not limited to cases where "compliance with the mandate or the Accommodation imposes a substantial burden" just misunderstands the substantial burden analysis. Opp. 5-6. As *Little Sisters* clarifies, the "substantial burden" is the objective "consequence[]" of non-compliance—the heavy fines levied by statute. 591 U.S. at 670 (quoting *Hobby Lobby*, 573 U.S. at 691). So the Mandate substantially burdens religious practice "to the extent that an entity ... objects" based on a sincere religious belief—the exact line drawn by the Final Rule. 45 C.F.R. § 147.132(a)(2). And while the States insist that the Final Rule must be overbroad unless it provides for a government-directed sincerity review on top of multiple private rights of action, they decline to engage with other federal exemptions not conditioned on such review. *See* Br. 23-24.

With the claims that the Final Rule extends to non-objectors set aside, the States' remaining overbreadth claim is against an exemption for for-profits not closely held. Opp. 5. But the States ignore that *Little Sisters* specifically blesses the agencies' discretion to resolve an "uncertain legal question" in favor of religious objectors. Opp. 5; *see Little Sisters*, 591 U.S. at 681 (discussing *Zubik*'s "direct[ion]" to accommodate without a final decision as to whether the "accommodation ran afoul of RFRA"). And the agencies' interpretation was perfectly reasonable where the *Hobby Lobby* Court found, for example, that free exercise law pre-RFRA had historically protected for-profits. 573 U.S. at 708, 714-16. The Court's brief discussion of publicly traded companies did not suggest any exception to that principle, only providing a "practical" note as to the unlikelihood

that companies with many "unrelated shareholders—including institutional investors" would decide to operate under shared religious beliefs—yet another hurdle to the States' Article III standing. *Id.* at 717; *supra* Part I.

**F. The Final Rule is severable.**

The States agree with the Little Sisters that "[w]hen only some parts of a regulation are unlawful, they may be set aside and the rest of the regulation saved." States Br. 44. Yet the States miss the point, saying that severability won't matter if they win on *every single claim*. *Id.* ("no aspect of the Rules is spared from [all of] the flaws" the States have claimed). In their opposition brief, the States offer no new arguments against severing any portions of the Final Rules. But severability *does* matter to each of the States' overbreadth claims. If the Court finds only the protections for publicly traded companies and nonreligious objectors improper, the States have provided no reason to not simply sever 45 C.F.R. § 147.132(a)(1)(i)(D) and 45 C.F.R. § 147.133 and leave the other protections undisturbed. Likewise, this Court can sever any *application* of the Final Rule to organizations whose sincere religious belief does not require them to make use of the exemption, if it agrees with the States that the Final Rule covers any such organizations. Br. 44-45; *see, e.g.*, *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504-06 (1985) ("severability clause" cut in favor of declaring statute "invalid to the extent that it reaches too far, but otherwise left intact"). The severability clause of the Final Rule contemplates and approves severance when a provision is held "invalid or unenforceable by its terms, or as applied to any person or circumstance." 45 C.F.R. § 147.132(d).

The States admit that severability is an option and cite no authority that it should not be used here. There are multiple specific provisions that can be carved out, Br. 44-45, but in any case, this Court can sever any part of the regulation that is overbroad.

## CONCLUSION

This Court should grant summary judgment in favor of the Defendants and deny the States' summary judgment motion. In the alternative, Defendant-Intervenor respectfully requests that, if the Court accepts the States' arguments and invalidates the Final Rules, the Court also invalidate the regulations implementing the Mandate prior to October 13, 2017.

Dated: June 27, 2025

Nicholas M. Centrella
Conrad O'Brien PC
1500 Market Street, Suite 3900
Philadelphia, PA 19102-2100
Telephone: (215) 864-8098
Facsimile: (215) 864-0798
ncentrella@conradobrien.com

Respectfully submitted,

/s/ Mark Rienzi
Mark Rienzi, *pro hac vice*
Lori Windham, *pro hac vice*
Eric Rassbach, *pro hac vice*
Diana Verm Thomson, *pro hac vice*
Adèle Auxier Keim, *pro hac vice*
Daniel L. Chen, *pro hac vice*
Benjamin A. Fleshman, *pro hac vice*
Kelsey Baer Flores, *pro hac vice*
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Facsimile: (202) 955-0090
mrienzi@becketfund.org

*Counsel for Intervenor-Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Pennsylvania using the CM/ECF system, and that service will be effectuated through the CM/ECF system.

Dated: June 27, 2025

                    /s/ *Mark Rienzi*
                    Mark Rienzi