IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA AND STATE OF NEW JERSEY, | CIVIL ACTION |
| Plaintiffs, | |
| v. | NO. 17-4540 |
| DONALD J. TRUMP, ROBERT F. KENNEDY, JR., UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, SCOTT BESSENT, UNITED STATES DEPARTMENT OF THE TREASURY, LORI CHAVEZ-DeREMER, THE UNITED STATES DEPARTMENT OF LABOR, AND THE UNITED STATES OF AMERICA, | |
| Defendants, | |
| LITTLE SISTERS OF THE POOR SAINTS PETER AND PAUL HOME, | |
| Defendant-Intervenor. | |

## OPINION

Plaintiffs, the Commonwealth of Pennsylvania and the State of New Jersey (collectively "the States"), have sued the United States of America, President Donald J. Trump, the United States Secretary of Health and Human Services Robert F. Kennedy, Jr., the United States Secretary of the Treasury Scott Bessent, and the United States Secretary of Labor Lori Chavez-DeRemer in their official capacities, as well as each of the agencies they head up (collectively

"Defendants"),[1] challenging two regulations: *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,536, 57,536 (Nov. 15, 2018) ("Religious Rule" or "Religious Exemption Rule"); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592, 57,592 (Nov. 15, 2018) ("Moral Rule" or "Moral Exemption Rule") (together, "the Final Rules").

The Religious and Moral Rules concern the Women's Health Amendment, 42 U.S.C. § 300gg-13(a)(4)—a portion of the Affordable Care Act ("ACA"), Pub L. No. 111-148, 124 Stat. 119 (2010)—in which Congress required that health insurance plans cover women's preventive services. Because the Health Resources and Services Administration ("HRSA") has interpreted that requirement to include contraception, *see* HRSA, *Women's Preventive Services Guidelines*, *available at* https://www.hrsa.gov/womens-guidelines/index.html, most employers have—in years past—been required to provide coverage for contraception and contraception-related counseling. That requirement became known as "the Contraceptive Mandate."

Before the promulgation of the Religious and Moral Rules, a narrow class of non-profit religious organizations as well as certain other organizations (such as closely held, for-profit businesses whose owners sincerely objected to providing contraception on religious grounds) were not required to comply with the Contraceptive Mandate. In 2017, however, the Departments of Health and Human Services ("HHS"), Labor, and the Treasury (collectively, the "Agencies"), promulgated the first iteration of the Rules, known as the "Interim Final Rules" ("IFRs"), which greatly expanded that exemption and accommodation framework, allowing

---

[1] The States originally sued the Secretaries from President Trump's first term in office, but the current Secretaries were "automatically substituted as" parties pursuant to Federal Rule of Civil Procedure 25(d).

more entities to take advantage of the exemption or accommodation.

Pennsylvania (later joined by New Jersey) sued to halt that broad expansion of exemptions and accommodations, challenging the Rules in their entirety as, *inter alia*, contrary to the Administrative Procedure Act's ("APA"), 5 U.S.C. § 551, *et seq*, notice-and-comment requirement, *see id.* § 553.; in excess of the Agencies' statutory authority to promulgate regulations, *see id.* § 706(2)(C); and, as "arbitrary [and] capricious" again in violation of the APA, *see id.* § 706(2)(A). This Court enjoined enforcement of the IFRs soon thereafter. S*ee Pennsylvania v. Trump* ("*Pennsylvania I*"), 281 F. Supp.3d 553 (E.D. Pa. 2017).

While the appeal of that preliminary injunction was pending, Defendants "finalized" the IFRs (making them "Final Rules"), enforcement of which this Court also enjoined in January 2019. *See Pennsylvania v. Trump* ("*Pennsylvania II*"), 351 F. Supp.3d 791 (E.D. Pa. 2019). During that litigation, Little Sisters of the Poor Saints and Paul Home ("Little Sisters" or "Defendant-Intervenor")—an "international Roman Catholic congregation whose mission is to serve the elderly poor"—intervened to "defend . . . portions of the" Religious Rule "that apply to" it, and to "seek the same relief as the federal government." *Pennsylvania v. President United States of Am.*, 888 F.3d 52, 57 n.2, 58 (3d Cir. 2018).

The injunctions were based on this Court's determination that the Defendants had failed to comply with the requirements of notice-and-comment rulemaking (meaning the Interim Final Rules and Final Rules were procedurally invalid), and that the Defendants did not have the statutory authority to issue the Rules. *Pennsylvania I*, 281 F. Supp.3d at 570-81; *Pennsylvania II*, 351 F. Supp.3d at 810-27. The Third Circuit affirmed this Court's decisions, *see Pennsylvania v. President United States of Am.* ("*Pennsylvania III*"), 930 F.3d 543 (3d Cir. 2019), but the Supreme Court reversed the Third Circuit, *see Little Sisters of the Poor Saints*

*Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020).  As for the notice-and-comment requirement, the majority opinion of the Supreme Court held that Defendants had done all that was required of them.  *Id.* at 683-84.  It also held that Defendants were statutorily authorized to create religious and moral accommodations and exemptions to the Women's Health Amendment, such as the Final Rules.  *Id.* at 663.

This Court did not address, however, in either of its preliminary-injunction opinions, whether the Agencies exercised their statutory authority properly in accordance with the APA's command that agency action not be "arbitrary [or] capricious."  5 U.S.C. § 706(2)(A).  In other words, this Court has yet to decide whether the Agencies complied with the APA's requirement that they act with "reasoned decisionmaking." *Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring in the judgment) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).  "That issue"—whether the Defendants' actions in promulgating the Final Rules were arbitrary and capricious—"is now ready for resolution." *Id.*

In their Cross Motions for Summary Judgment pursuant to Federal Rule of Civil Procedure 56, the parties have entirely different views as to whether the Final Rules fail (in the States' view) or pass (in Defendants' and Defendant-Intervenor's view) the APA's reasoned-decisionmaking requirement.  For the reasons set forth below, the Court finds that, in promulgating the Religious Exemption Rule and the Moral Exemption Rule, the Agencies actions were "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).  Accordingly, the States' Motion for Summary Judgment shall be granted, Defendants' and Defendant-Intervenor's Motion for Summary Judgment shall be denied, and the Final Rules shall be vacated *in toto*.

## I.    BACKGROUND

Although the relevant factual and procedural history of this dispute has been laid out at

length before, s*ee Pennsylvania I*, 281 F. Supp.3d at 560-64; *Pennsylvania II*, 351 F. Supp.3d at 798-804 it is recounted here to set the stage for what follows.

### A. The Contraceptive Mandate

In March 2010, Congress enacted the Affordable Care Act. *See* Patient Protection and Affordable Care Act ("ACA"), Pub L. No. 111-148, 124 Stat. 119 (2010). A provision of the ACA, the Women's Health Amendment, mandated that insurance providers cover preventive health services and screenings for women without imposing cost-sharing responsibilities. Specifically, the Women's Health Amendment requires that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration ["HRSA"] for purpose of this paragraph." 42 U.S.C. § 300gg-13(a)(4). This requirement applies to all health insurers offering individual or group insurance, as well as all group health plans, with an exception for certain "grandfathered" plans. 42 U.S.C. § 18011 (exempting "grandfathered" plans); *see also* 29 C.F.R. § 2590.715-1251 (2010).

Under the Women's Health Amendment, "non-grandfathered group health plans and health insurance issuers are required to provide coverage consistent with the HRSA Guidelines, without cost sharing." *Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 77 Fed. Reg. 8,725, 8,725 (Feb. 15, 2012). Together, these interlocking statutory and regulatory requirements created what has come to be known as the "Contraceptive Mandate."

In that Congress did not enumerate the preventive services to be covered by the Women's

Health Amendment, but rater delegated that decision to HRSA (which is housed within Defendant Department of Health and Human Services ("HHS")), HRSA commissioned the then-named Institute of Medicine ("the Institute") to convene a panel of experts to provide recommendations.[2]  On July 19, 2011, the Institute issued its report, recommending that the ACA cover "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  Institute of Medicine, *Clinical Prevention Services for Women: Closing the Gaps*, at 109-10 (2011).

On August 1, 2011, HRSA issued its preventive care guidelines ("2011 Guidelines"), adopting the Institute's recommendations.  *See* HRSA, *Women's Preventive Services Guidelines*, *available at* https://www.hrsa.gov/womens-guidelines/index.html.[3]  The 2011 Guidelines hewed to the Institute's report, defining preventive care to include all FDA-approved "contraceptive methods, sterilization procedures, and patient education and counseling."  *Id.*  The report concluded that contraception reduces unintended pregnancies, the health risks associated with unintended pregnancies could be reduced if contraception is used correctly, and cost is a barrier to effective contraceptive use.  *Id.*

### B.  Initial Regulatory Action to Accommodate Religious Objections

Based on "considerable feedback," the Agencies found it was "appropriate that HRSA, in issuing [the 2011] Guidelines, take[] into account the effect on the religious beliefs of certain

---

[2] The Institute, renamed the National Academy of Medicine in 2015, is an arm of the National Academy of Sciences, an organization that Congress established for the explicit purpose of furnishing advice to the federal government.  *See Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 460 n.11 (1989).

[3] HRSA has updated the Gudelines numerous times since 2011 but continues to define "preventive services" to include contraceptive services and counseling.  *See* HRSA, *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines (last visited August 12, 2025).

religious employers if coverage of contraceptive services were required."[4]  *Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act*, 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011).  The Agencies therefore provided HRSA with "additional discretion to exempt certain religious employers from the Guidelines where contraceptive services are concerned."  *Id.*

On August 1, 2011, the Agencies promulgated an interim final rule exempting certain religious employers from providing contraceptive services.  *Id.*  Under the exemption, a "religious employer" could be exempt from the Contraceptive Mandate only if it: (1) had the inculcation of religious values as its purpose; (2) primarily employed people who shared its religious tenets; (3) primarily served persons who shared its religious tenets; and (4) was a church, its integrated auxiliary, or a convention or association of a church exempt from taxation under the Internal Revenue Code.  *Id.*  On February 15, 2012, after considering more than 200,000 responses to this interim final rule, the Agencies issued a final rule adopting the "religious employer" definition.  77 Fed. Reg. at 8,725.

On March 21, 2012, the Agencies issued a notice of proposed rulemaking requesting comments on "alternative ways of providing contraceptive coverage without cost sharing in order to accommodate non-exempt, non-profit religious organizations with religious objections to such coverage."  *Certain Preventive Services Under the Affordable Care Act*, 77 Fed. Reg. 16,501, 16,503 (March 21, 2012).  After receiving and considering over 400,000 comments, the Agencies issued their final rule on July 2, 2013.  *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870, 39,871 (July 2, 2013).  The final rule had two

---

[4] The Departments of HHS, Labor, and the Treasury "jointly administer the relevant ACA provision."  *Little Sisters*, 591 U.S. at 663 & n.1 (citing 42 U.S.C. § 300gg-92; 29 U.S.C. § 1991c; 26 U.S.C. § 9833).

noteworthy effects.

First, the rule "eliminate[ed] the first three prongs and clarif[ied] the fourth prong of the definition" of "religious employer" adopted in 2012. *Id.* at 39,874. Under the new definition, an entity qualified as a "religious employer" so long as it "is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii)" of the Internal Revenue Code, which applies to "churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order." *Id.*

Second, the rule established an accommodation for "eligible organizations" with religious objections to providing contraceptive coverage (the "Accommodation"). *Id.* The rule defined an "eligible organization" as one that: "(1) [o]pposes providing coverage for some or all of the contraceptive services required to be covered . . . ; (2) is organized and operates as a nonprofit entity; (3) holds itself out as a religious organization; and (4) self-certifies that it satisfies the first three criteria." *Id.* Under the Accommodation, an eligible organization was required to provide a copy of the self-certification to its insurance provider, which then would provide contraceptive coverage to the organization's employees. *Id.* at 39,876. Thus, an eligible organization that self-certified as such was "not required to contract, arrange, pay, or refer for contraceptive coverage," but its "plan participants and beneficiaries [would] still benefit from separate payments for contraceptive services without cost sharing or other charge," consistent with the Contraceptive Mandate. *Id.* at 39,874.

### C.  *Hobby Lobby* & *Wheaton College*

Meanwhile, a host of legal challenges to the Contraceptive Mandate progressed through the federal courts, several of which eventually reached the Supreme Court.

On June 30, 2014, the Supreme Court issued its opinion in *Burwell v. Hobby Lobby*

*Stores, Inc.*, 573 U.S. 682 (2014).  There, three closely held for-profit corporations (rather than religious non-profits, who already benefitted from the Accommodation) challenged the Contraceptive Mandate as violating the religious beliefs of the corporations' owners.  *Id.* at 700-06.  The Supreme Court held that the application of the Contraceptive Mandate to the organizations violated the Religious Freedom Restoration Act  ("RFRA"), 42 U.S.C. § 2000bb-1, *et seq.*, because the Contraceptive Mandate imposed a substantial burden on the plaintiffs' religious exercise and was not the "least restrictive means" of guaranteeing cost-free access to certain methods of contraception.  573 U.S. at 726-32.  The Supreme Court explained that the existence of the Accommodation supported its conclusion that applying the Contraceptive Mandate to the plaintiffs was not the "least restrictive means": "HHS itself has demonstrated that it has at its disposal an approach that is less restrictive than requiring employers to fund contraceptive methods that violate their religious beliefs. . . .  HHS has already established an accommodation for nonprofit organizations with religious objections."  *Id.* at 730.  Nevertheless, the Supreme Court refrained from deciding "whether an approach of this type"—meaning the Accommodation—"complies with RFRA for purposes of all religious claims."  *Id.* at 731.

A few days later, the Supreme Court issued an order in a related case, *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014) (*per curiam*).  There, Wheaton College, an organization eligible for the Accommodation, sought from the Supreme Court an injunction pending appellate review "on the theory that its filing of a self-certification form [would] make it complicit in the provision of contraceptives by triggering the obligation for someone else to provide the services to which it objects."  *Id*. at 2808 (Sotomayor, J., dissenting).  The Supreme Court granted the injunction, permitting Wheaton College to "inform[] the Secretary of Health and Human Services in writing that it . . . has religious objections to providing coverage for contraceptive

services"—that is, the college did not have to "use the [self-certification] form prescribed by the [g]overnment." *Id.* at 2807 (*per curiam*). The Supreme Court cautioned, however, that the "order should not be construed as an expression of the Court's views on the merits." *Id.* And it emphasized that its decision should not reduce the ability of individuals "to obtain, without cost, the full range of FDA approved contraceptives" as HHS could rely on the notice to "facilitate the provision of full contraceptive coverage under the Act." *Id.*

### D.  Regulatory Response to *Hobby Lobby* & *Wheaton College*

The Agencies responded to *Hobby Lobby* by issuing a notice of proposed rulemaking "amend[ing] the definition of an eligible organization [for purposes of the Accommodation] to include a closely held for-profit entity that has a religious objection to providing coverage for some or all of the contraceptive services otherwise required to be covered." *Coverage of Certain Preventive Services Under the Affordable Care Act*, 79 Fed. Reg. 51,118, 51,121 (Aug. 27, 2014). Furthermore, the Agencies issued an interim final rule, effective immediately, that provided "an alternative process" for Accommodation-eligible organizations to self-certify "consistent with the *Wheaton* order," *i.e.*, by notifying HHS—rather than their insurance provider—of their objection. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 79 Fed. Reg 51,092, 51,094-96 (Aug. 27, 2014). On July 14, 2015, the Agencies issued a rule that finalized the extended Accommodation and alternative self-certification process. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 80 Fed. Reg. 41,318, 41,323-24 (July 14, 2015).

### E.  *Zubik* Remand and Impasse

On May 16, 2016, the Supreme Court issued its third decision regarding the Contraceptive Mandate. In *Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam), several

organizations eligible for the Accommodation challenged the self-certification process on the grounds that the requirement to submit a notice either to their insurer *or* the federal government (the latter of which the Accommodation now allowed post-*Wheaton College*) violated the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1, *et seq. Id.* at 406-07. The Supreme Court declined to reach the merits of the dispute, requesting instead "supplemental briefing from the parties addressing 'whether contraceptive coverage could be provided to petitioners' employees, through petitioners' insurance companies, without any such notice from petitioners.'" *Id.* at 407. After the parties—including some of the Agencies present before the Court today—agreed that "such an option [was] feasible," the Supreme Court remanded to afford them "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage." *Id.* at 407-08 (internal quotation marks omitted). Again, though, the Supreme Court "express[ed] no view on the merits of the cases," and refrained from "decid[ing] whether petitioners' religious exercise has been substantially burdened, whether the [g]overnment has a compelling interest, or whether the current regulations are the least restrictive means of serving that interest." *Id.* at 409.

Following the remand, the Agencies reached an impasse. After reviewing over 50,000 comments submitted in response to a request for information, the Agencies concluded that there was "no feasible approach . . . at this time that would resolve the concerns of religious objectors, while still ensuring that the affected women receive full and equal health coverage, including contraceptive coverage." Dep't of Labor, *FAQs About Affordable Care Act Implementation Part 36*, at 4 (2017), *available at* https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resource-center/faqs/aca-part-36.pdf. As a result of that conclusion, the Agencies left

the Accommodation—now conforming with *Hobby Lobby* (meaning closely-held corporations with religious objections could make use of it) and *Wheaton College* (meaning notifying the federal government was all that was required to take advantage of the Accommodation)—in place for the time being.

### F. The Interim Final Rules and First Preliminary Injunction

On May 4, 2017, President Donald Trump issued an Executive Order entitled "Promoting Free Speech and Religious Liberty."  Exec. Order No. 13,798, 82 Fed. Reg. 21,675 (May 4, 2017).  The Order directed the Agencies to "consider issuing amended regulations, consistent with applicable law, to address conscience-based objections to the preventive-care mandate promulgated under [the Women's Health Amendment]."  *Id.* at § 3.

On October 6, 2017, aiming to be "[c]onsistent with the President's Executive Order and the Government's desire to resolve the pending litigation and prevent future litigation from similar plaintiffs," *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47,792, 47,799 (Oct. 13, 2017), the Agencies issued two new IFRs, referred to as the Religious Exemption IFR and the Moral Exemption IFR.  *See id.* at 47,792 ("Religious Exemption IFR"); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 82 Fed. Reg. 47,838, 47,838 (Oct. 13, 2017) ("Moral Exemption IFR").

The IFRs made several significant changes to the prior exemption and Accommodation framework.[5]  For one, the Moral Exemption IFR made the exemption—previously available only

---

[5] The list of changes made by the IFRs, and subsequently the Final Rules, outlined herein is not exhaustive.  For example, the IFRs also changed the level at which exemptions are to be applied.  So, whereas before the availability of an exemption was to be "'determined on an employer by employer basis,'" the IFRs provide that an exemption "will be determined on a plan basis."  82 Fed. Reg. at 47,810.  The effect of this change, according to Plaintiff States, is that an employer may disregard the Contraceptive Mandate by adopting a group health plan "established or

12

for houses of worship and organizations associated with them—available to "additional entities," including for-profit entities that are not publicly traded, that object to providing contraception coverage based on "sincerely held *moral* convictions," without any need for the objection to be grounded in a *religious* objection to contraception.  82 Fed. Reg. at 47,862 (emphasis added). Second, the Religious Exemption IFR significantly broadened the scope of the religious exemption to encompass any non-profit or for-profit entity, whether closely held or publicly traded.  82 Fed. Reg. at 47,810.  Third, the IFRs "likewise" expanded eligibility for the Accommodation, such that entities—closely held or not—with sincerely held religious or moral convictions could take advantage of the Accommodation process.  82 Fed. Reg. at 47,813; 82 Fed. Reg. at 47,849.  Fourth, the IFRs made "the accommodation process optional for eligible organizations," such that entities taking advantage of the Accommodation would "not be required to comply with a self-certification process."  82 Fed. Reg at 47,808; 82 Fed. Reg. at 47,850.  Finally, the IFRs eliminated the requirement to provide notice of an intent to take advantage of the exemption or Accommodation—entities that stop providing contraceptive care "do not need to file notices or certifications of their exemption."  82 Fed. Reg. at 47,808; 82 Fed. Reg. at 47,850.  Thus, the IFRs permit entities with religious or moral objections to forgo providing contraceptive coverage to employees without "fil[ing] notices or certifications of their exemption."  82 Fed. Reg. at 47,838.[6]

The IFRs became effective immediately.  82 Fed. Reg. at 47,815; 82 Fed. Reg. at 47,856.

---

maintained" by an objecting organization, *id.*, even if the employer itself does not hold a sincere religious or moral objection to contraception.

[6] Nevertheless, they do not completely free such accommodated entities from all reporting requirements.  The IFRs note that ERISA requires certain disclosures: "[u]nder ERISA, the plan document provides what benefits are provided to participants and beneficiaries under the plan and, therefore, if an objecting employer would like to exclude all or a subset of contraceptive services, it must ensure that the exclusion is clear in the plan document."  82 Fed. Reg. at 47,850.

The Commonwealth filed suit seeking to enjoin their enforcement, arguing: (1) they failed to comply with the notice-and-comment procedures required by the APA, 5 U.S.C. § 551, *et seq*.; (2) they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the substantive provisions of the APA, 5 U.S.C. § 706(2)(A); (3) they violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2, *et seq*.; (4) they violated the Equal Protection Guarantee of the Fifth Amendment, U.S. Const. amend. V; and, (5) they violated the Establishment Clause, U.S. Const. amend. I. This Court granted the preliminary injunction, determining that: the Commonwealth had standing to sue Defendants; the Commonwealth was likely to succeed on its claims that the IFRs were not promulgated in compliance with the APA's notice-and-comment requirement (which is a different question as to whether the agency action not be arbitrary or capricious); and, the Rules exceeded the Agencies' statutory authority.[7] *Pennsylvania I*, 281 F. Supp.3d at 564-81. Defendants subsequently appealed that decision and, on February 9, 2018, requested a stay of proceedings while the appeal was pending, which request this Court granted.[8]

### G. The Final Rules & Second Motion for Preliminary Injunction

---

[7] The Court did not, however, reach the merits of the other statutory and constitutional claims. Now, in their brief, the States abandon those non-APA claims, arguing only that the Rules are "arbitrary [and] capricious" in violation of 5 U.S.C § 706(2)(A), and request that the Court dismiss their remaining claims under Federal Rule of Civil Procedure 41, which the Court will do. Fed. R. Civ. P. 41(a) (detailing that a claim may be dismissed at the plaintiff's request by court order).

[8] Following this Court's issuance of a preliminary injunction, several other district courts issued decisions regarding the propriety of the IFRs. *See California v. Health & Human Servs.*, 281 F. Supp.3d 806, 832 (N.D. Cal. 2017) (enjoining the IFRs for violating the procedural requirements of the APA only*), aff'd in part, vacated in part, remanded sub nom.*, *California v. Azar*, 911 F.3d 558, 566 (9th Cir. 2018) (upholding the lower court's conclusion on the merits, but striking down the remedy as overbroad); *California v. Health & Human Servs.*, 351 F. Supp.3d 1267, 1271 (N.D. Cal. 2019) (enjoining the Final Rules because the Rules were not authorized by the ACA and were not mandated by RFRA), *aff'd*, 941 F.3d 410 (9th Cir. 2019), *cert. granted, judgment vacated sub nom. Dep't of Health & Hum. Servs. v. California*, 141 S. Ct. 192 (2020); *Massachusetts v. Health & Human Servs.*, 301 F. Supp.3d 248, 266 (D. Mass. 2018) (finding State lacked standing to challenge the IFRs), *rev'd and remanded* 923 F.3d 209 (1st Cir. 2019); *Massachusetts v. U.S. Dep't of Health & Human Servs.*, 513 F. Supp.3d 215 (2021) (granting summary judgment for the Agencies), *app. docketed*, No. 21-1076 (1st Cir. Jan. 28, 2021).

After the stay, on November 15, 2018, while their appeal of the preliminary injunction was pending before the Third Circuit, the Agencies promulgated two new rules that "finalize[d]" the IFRs. *Religious Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,536, 57,536 (Nov. 15, 2018) ("Religious Rule" or "Religious Exemption Rule"); *Moral Exemptions and Accommodations for Coverage of Certain Preventive Services Under the Affordable Care Act*, 83 Fed. Reg. 57,592, 57,592 (Nov. 15, 2018) ("Moral Rule" or "Moral Exemption Rule"). "In response to public comments," the Agencies made "various changes" to the Final Rules "to clarify the intended scope of the language" in the IFRs. 83 Fed. Reg. at 57,537; 83 Fed. Reg. at 57,593. The changes, however, were largely "non-substantial technical revisions." 83 Fed. Reg. at 57,567. The Final Rules were scheduled to take effect on January 14, 2019. 83 Fed. Reg. at 57,567; 83 Fed. Reg. at 57,592.

The Commonwealth then sought to lift the stay to challenge the Final Rules. The Court granted the motion, and Pennsylvania—now joined by New Jersey—filed an Amended Complaint and a Second Motion for a Preliminary Injunction, seeking to enjoin enforcement of the Final Rules.[9] This Court again granted a preliminary injunction, enjoining enforcement of the Final Rules nationwide. *See Pennsylvania II*, 351 F. Supp.3d at 835. The Court concluded that the States had standing to sue the Defendants, that the Agencies' acceptance of comments following the issuance of the interim rules did not cure their violation of the APA's procedural requirements in promulgating the IFRs, and that the Agencies lacked authority, under either the ACA or RFRA, to create exemptions from the Guidelines. *Id.* at 812-27.

---

[9] The Third Circuit stayed Defendants' appeal pending the resolution of the Second Motion for a Preliminary Injunction. *Pennsylvania v. President United States of Am.*, No. 17-3752 (3d Cir. Jan. 9, 2019).

### H.  Third Circuit and Supreme Court Appeals

Defendants and Defendant-Intervenor appealed.[10]  On July 12, 2019, the Third Circuit affirmed this Court's order preliminarily enjoining the Rules' enforcement.  *See Pennsylvania III*, 930 F.3d at 556.  The Third Circuit determined that the States had standing to sue the Defendants because they "ha[d] established that they will suffer a concrete and particularized injury," if the Rules were enforced, *id.* at 562, that such an injury was "imminent," "causally connected and fairly traceable" to the Rules, *id.* at 564, and that "an injunction would redress the financial injury the States face from the Rules," *id.*  The Third Circuit further determined that the Agencies' declination to engage in typical notice-and-comment rulemaking when promulgating the IFRs rendered the Rules procedurally deficient, *id.* at 568, and that the subsequent notice-and-comment period (which came after the IFRs were promulgated but before the Final Rules' promulgation) did not cure the problem, *id.* at 569.  And finally, the Third Circuit determined that the Agencies had no statutory authorization under the ACA to promulgate exemptions to the contraceptive mandate, *id.* at 570, and that RFRA did not require them to do so, *id.* at 572.

Defendants and Defendant-Intervenor appealed to the Supreme Court.  On July 8, 2020, the Supreme Court reversed the Third Circuit, holding that the Final Rules were not procedurally invalid under the APA, insofar as they met the requirements of notice-and-comment rulemaking. *Little Sisters*, 591 U.S. at 683-86.  It further held that the ACA authorized the Agencies to define the scope of the Contraceptive Mandate, and that therefore, they could promulgate regulations

---

[10] Following the Commonwealth's initial motion for a preliminary injunction, Defendant-Intervenor Little Sisters filed a motion to intervene.  The Court denied that motion.  *See Pennsylvania v. Trump*, 2017 WL 6206133, at *1 (E.D.Pa. Dec. 8, 2017).  On appeal, however, the Third Circuit reversed, remanding the case to permit intervention. *See Pennsylvania v. President United States of Am.*, 888 F.3d 52, 62 (3d Cir. 2018).  The Court duly vacated its prior ruling and granted Defendant-Intervenor Little Sisters' motion.

exempting religious organizations from the Contraceptive Mandate's ambit, *id.* at 663.[11]  In so

doing, the Supreme Court rejected the States' argument "that the Departments could not even

consider RFRA as they formulated the religious exemption from the contraceptive mandate."  *Id.*

at 680.  But the majority opinion expressly declined to reach the question of whether the Final

Rules were required by RFRA.  *Id.*

Justice Alito and Justice Kagan each wrote concurrences, partially at odds with one

another.  In Justice Alito's view (with Justice Gorsuch joining), at least the Final Religious Rule

was "required by RFRA."  *Id.* at 704 (Alito, J., concurring).  RFRA, Justice Alito recapped, of

course "prohibits the Federal Government from violating religious liberty."  *Id.* at 691.  And

*Hobby Lobby*, in Justice Alito's view, "established that application of the contraceptive mandate

must conform to RFRA's demands.  Thus," the Agencies had "to ensure that the rules

implementing the mandate were consistent with RFRA."  *Id.*  Under *Hobby Lobby*, "requiring

the Little Sisters or any other employer with a similar religious objection to comply with the

mandate would impose a substantial burden."  *Id.* at 692.  As Justice Alito understood the

religious objections at issue in *Zubik*, Little Sisters (and others) "objected" to the

Accommodation framework (even after it had been amended in light of *Hobby Lobby* and

*Wheaton College*), because, despite religious employers not being required to pay for

contraceptives, those employers "took strong exception to the requirement that they maintain and

pay for a plan under which coverage for contraceptives would be provided."  *Id.* at 694.  "[T]hey

also objected to submission of the self-certification form . . . because without the certification

their plan could not be used to provide contraceptive coverage."  *Id.*  And although the Supreme

---

[11] Defendants request that—based on the Supreme Court's reversal of the Third Circuit—the Court enter summary judgment in favor of Defendants on the States' claims that the Agencies acted in excess of statutory authority and in violation of the APA's notice-and-comment requirement, which the Court shall do.

Court had hoped that the *Zubik* remand would solve the problem, nothing came from it, and "[t]he inescapable bottom line [was] that the accommodation demanded that parties like the Little Sisters engage in conduct that was a necessary cause of the ultimate conduct to which they had strong religious objections." *Id.* at 695. Finally, Justice Alito's opinion was that the Government did not have a compelling interest in ensuring that women had free access to FDA-approved contraceptives, *id.* at 696, and that even if it did, it was not the least restrictive means of achieving that interest, meaning the Final Religious Rule was required by RFRA, *id.* at 700.

Justice Kagan, concurring in the judgment, joined by Justice Breyer, agreed that the Agencies had the authority under the ACA to create exemptions and accommodations to the Women's Health Amendment. *Id.* at 704-05 (Kagan, J., concurring in the judgment). But she emphasized that the majority's conclusion as such did "not mean the Departments should prevail when these cases return to the lower courts." *Id.* at 707. She explained that "[a]n agency acting within its sphere of delegated authority can of course flunk the [APA's] test of 'reasoned decisionmaking.'" *Id.* And in her view, "[a]ssessed against that standard of reasonableness, the exemptions HRSA and the Departments issued give every appearance of coming up short." *Id.*

Justice Kagan then described several ways in which, in her opinion, the Final Rules failed the APA's reasoned-decisionmaking requirement. She found "[m]ost striking [the] mismatch between the scope of the religious exemption and the problem the agencies set out to address." *Id.* "Recall that under the old system," before the Final Rules, "an employer objecting to the contraceptive mandate for religious reasons could avail itself of the 'self-certification accommodation.'" *Id.* "That device dispelled some employers' objections—but not all. The Little Sisters, among others, maintained that the accommodation itself made them complicit in providing contraception." *Id.* at 707-08. Although "the Departments might have chosen to

18

exempt Little Sisters and other still-objecting groups from the mandate," "the Departments went further still," "exempt[ing] all employers with objections to the mandate, even if the accommodation met their religious needs." *Id.* at 708. "In other words, the Departments exempted employers who *had no religious objection to the status quo*." *Id.* (emphasis added). And in her view, the problems with "the Departments' handiwork" did not stop there—ranging from the Final Rules "fail[ing] to fulfill" the Departments self-professed "commitment to women" to "minimize[e] the impact on contraceptive coverage," and the inclusion of publicly traded companies within the scope of the Religious Rule, to the issuance of the Moral Rule, which could not be justified by RFRA. *Id.* at 709.

Justice Ginsburg, joined by Justice Sotomayor, dissented and criticized the majority for "cast[ing] totally aside countervailing rights and interests in its zeal to secure religious rights to the nth degree." *Id.* at 710 (Ginsburg, J., dissenting). She read the Women's Health Amendment to grant HRSA the authority to identify *what* preventive services were to be covered, but not *who* was to cover them. *Id.* at 718-21. Justice Ginsburg then rejected the government's alternative argument that RFRA justified the Religious Rule, noting that the Rule "imposes significant burdens on women employees," *id.* at 724, and that the Accommodation "does not substantially burden objectors' religious exercise," *id.* at 727.

## I. Post-Remand Developments and The Present Motions for Summary Judgment

Following remand on August 21, 2020, the matter returned to this Court. The Parties filed Cross-Motions for Summary Judgment, but before the Court ruled on those Motions, Joseph R. Biden was elected President of the United States. After he took office, on the Agencies' representation that they intended to amend the Rules, the Court stayed this case. From the date of the stay in August 2021, by order of Court, the parties submitted status reports every

ninety days explaining the progress Defendants were making in the rulemaking process.

On February 2, 2023, the Agencies published a Notice of Proposed Rulemaking, *Coverage of Certain Preventive Services Under the Affordable Care Act*, 88 Fed. Reg. 7,236 (Feb. 2, 2023) ("2023 Proposed Rule").  The Rule would have, *inter alia*, "enable[ed] individuals" who were employed by an accommodated or exempt entity "to directly receive contraceptive services at no cost" and "provide them with access to all contraceptive services the plan or coverage would otherwise be required to cover, absent the exemption."  *Id.* at 7,252.  This became known as the "individual contraceptive arrangement" ("ICA").  *Id.*

The States, as part of a coalition of 21 state attorneys general, submitted a comment letter dated April 3, 2023 that: (1) supported the 2023 Proposed Rule to the extent it sought to rescind the moral exemption and improve access through the ICA; (2) opposed retention of the expanded religious exemption; and (3) proposed improvement to the proposed ICA, including (i) expanding the number of individuals eligible to participate in the ICA, (ii) publicizing the ICA to increase use by eligible individuals, providers, and issuers, (iii) increasing protections for eligible individuals who use the ICA, and (iv) improving the ICA's appeal for providers.  *See* Attorney Generals of 21 States, Commonwealths and Districts, Comment Letter on Proposed Rule for Coverage of Certain Preventive Services Under the Affordable Care Act (April 3, 2023).  The States urged the Agencies to "swiftly adopt our recommendations in the Final Rule."  *Id.* at 28.

After the comment period closed on April 3, 2023, Defendants requested further time for the Agencies to evaluate the more than 44,000 comments received.  In status reports filed January 22, 2024, and April 22, 2024, Defendants advised that the Agencies expected to publish a final rule in August 2024.  By status reports dated July 22, 2024, and October 21, 2024, Defendants advised that the final rule was expected to be published in December 2024.

Following the election of Defendant Trump to his second term as President, but before President

Biden's term came to an end, Defendants notified the Court and parties that the Agencies were

withdrawing the 2023 Proposed Rule in its entirety, effective upon publication on December 30,

2024. *See Coverage of Certain Preventive Services Under the Affordable Care Act*, 89 Fed. Reg.

106,393 (Dec. 30, 2024).

With the Final Rules still in place, the matter was ripe for resolution. The Parties now

cross-move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## II.    SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "Inferences to be drawn from the

underlying facts contained in the evidential sources must be viewed in the light most favorable to

the party opposing the motion." *Peters Twp. Sch. Dist. v. Hartford Acc. & Indem. Co.*, 833 F.2d

32, 34 (3d Cir. 1987).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record

evidence, could rationally find in favor of the non-moving party in light of his burden of proof."

*Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52). "The non-moving party may not

merely deny the allegations in the moving party's pleadings; instead, he must show where in the

record there exists a genuine dispute over a material fact." *Id.* (citation omitted). A moving

party is entitled to judgment as a matter of law where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323.

## III.    ANALYSIS

### A.  Standing

Although, this Court has twice determined that the States have standing, *Pennsylvania I*, 281 F. Supp.3d at 564-69; *Pennsylvania II*, 351 F. Supp.3d at 804-08, which determination was upheld by the Third Circuit, *Pennsylvania III*, 930 F.3d at 561-65, and neither Defendants nor Little Sisters challenged the States' standing on appeal to the Supreme Court, nevertheless, Little Sisters (but not Defendants) have once again challenged the States' standing to sue.[12]  But because "federal courts 'have an obligation to assure [them]selves of litigants' standing under Article III,'" Little Sisters' arguments will be duly evaluated.  *Wayne Land & Min. Grp., LLC v. Del. River Basin Comm'n*, 959 F.3d 569, 574 (3d Cir. 2020) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006)).

To reprise: A threshold question is whether the States have standing.  Standing is an entry pass into federal court—a constitutional requirement that "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  If the plaintiff does not have standing, then the Court lacks jurisdiction to hear the case.  *Hassan v. City of New York*, 804 F.3d 277, 289 (3d Cir. 2015), *as amended* (Feb. 2, 2016).  "No principle is more fundamental to the judiciary's proper role in our

---

[12] Little Sisters argues that this Court's and the Third Circuit's prior rejection of its standing arguments have been reversed by the Supreme Court, but that is an overreach.  The Supreme Court reversed the lower courts on grounds distinct from the issue of standing.  *Little Sisters*, 591 U.S. at 663.  And, because a court must assure itself of jurisdictional requirements like standing at every step of the litigation, even if the litigants do not press the issue, *Lewis v. Alexander*, 685 F.3d 325, 338 n.10 (3d Cir. 2012), it follows as a matter of logic that the Supreme Court concluded that the States had standing; otherwise, it would not have had jurisdiction to hear the case.

system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976). Standing "is part of this limitation." *Id.*

As articulated in this Court's previous opinions in this case, and as Little Sisters does not dispute in its Motion for Summary Judgment, the standing inquiry must be conducted in light of the fact that the States "are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *Pennsylvania I*, 281 F. Supp.3d at 564-67; *Pennsylvania II*, 351 F. Supp.3d at 805-06. Indeed, as States, attempting to "protect[]" their "quasi-sovereign interests" via "a procedural right that authorizes them to challenge the conduct at issue," they are "entitled to special solicitude in [the] standing analysis." *Massachusetts v. EPA*, 549 U.S. at 520; *see also Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016); *Texas v. Biden*, 20 F.4th 928, 969-70 (5th Cir. 2021), *rev'd and remanded on other grounds*, 597 U.S. 785 (2022). "If nothing else, that means imminence and redressability are easier to establish here than usual." *Texas v. Biden*, 20 F.4th at 970 (citing *Massachusetts v. EPA*, 549 U.S. at 517-18.

### i. *Preliminary Matters Pertaining to Standing*

The States argue that because they have established standing already in this litigation, they need not establish it again. Not necessarily so. "Standing is a 'jurisdictional requirement' that 'remains open to review at all stages of the litigation.'" *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) (quoting *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994)). And, in establishing standing, the plaintiff always bears the burden of proof. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

The reason Little Sisters provides for why it challenges standing again (despite all that has gone before) is that—it says—the question of standing is evaluated differently at the summary-judgment stage (*i.e.*, the stage at which the Court is now evaluating the States' claims) than at the preliminary-injunction stage (*i.e.*, the posture at which this case came before the Court in its last two determinations that the States had standing). The States, Little Sisters says, must show more now than they did then to surmount the standing hurdle.

So, despite having previously determined that the States have standing to sue, nevertheless, in an excess of caution, the Court once again tackles the question of whether the procedural posture of the case—summary judgment rather than preliminary injunction—affects the question of the State's standing. At summary judgment, the States must "'set forth by affidavit or other evidence specific facts' establishing standing." *Greenberg*, 81 F.4th at 384 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 412 (2013)). The States have done so here.[13]

### ii.    *Article III Standing*

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. First is "injury in fact": the States must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or

---

[13] The States argue that a recent Third Circuit case, *Hartnett v. Pennsylvania State Education Association*, suggests that "once the plaintiff shows standing at the outset, she need not keep doing so throughout her lawsuit." 963 F.3d 301, 305 (3d Cir. 2020). But *Hartnett* did not purport to depart from the long-settled understanding that "the plaintiff bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *FOCUS v. Allegheny Cnty. Ct. of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996) (citation omitted). Rather, the Third Circuit's holding was that "[s]tanding and mootness," a related doctrine, "allocate different . . . burdens." *Hartnett*, 963 F.3d at 305. Indeed, *Hartnett* reaffirmed that "the burden rests on the plaintiff . . . to show standing to sue," then went on to clarify that the defendant bears the burden of establishing that "some development has *mooted the case*." *Id.* at 305-06 (emphasis added). Little Sisters challenges the States' standing, not that something has mooted the case, so *Hartnett* is inapposite here.

hypothetical." *Id.* (internal quotation marks and citations omitted).  Second, there must be a

"causal connection between the injury and the conduct complained of"—meaning the injury

must be "fairly traceable" to the "challenged action of the defendant."  *Id.* (cleaned up).  Third,

the States must show that it is "likely, as opposed to merely speculative, that the injury will be

redressed by a favorable decision."  *Id.* at 561 (internal quotation marks omitted).

As for injury in fact, the Final Rules inflict a direct injury upon the States by imposing

substantial financial burdens on their coffers.  An agency rule that has "a major effect on the

states' fiscs" is sufficient to find injury in fact.  *Texas v. United States*, 809 F.3d at 152; *id.* at

155 ("[Texas] satisfied the first standing requirement by demonstrating that it would incur

significant costs in issuing driver's licenses to DAPA beneficiaries."); *see also Wyoming v.*

*Oklahoma*, 502 U.S. 437, 448 (1992) (holding that Wyoming had Article III standing because it

undisputedly suffered a "direct injury in the form of a loss of specific tax revenues"); *Danvers*

*Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) ("While it is difficult to

reduce injury-in-fact to a simple formula, economic injury is one of its paradigmatic forms.").

And as the Third Circuit aptly summarized:

> [T]he Agencies' regulatory impact analysis acknowledges that between
> 70,500 and 126,400 women nationwide will lose contraceptive coverage
> as a result of their employers' invocation of the Religious Exemption, 83
> Fed. Reg. at 57,578, 57,581, and fifteen women will lose coverage as a
> result of their employers' use of the Moral Exemption, 83 Fed. Reg. at
> 57,627.

*Pennsylvania III*, 930 F.3d at 562.  "The States will suffer this injury in a particularized manner,

as each State's coffers will be depleted by the expenditure of funds to meet the increased demand

for state services."  *Id.*

Resisting that conclusion, Little Sisters faults the States for not yet identifying any

specific entity that has declined contraceptive coverage due to the Final Rule being in effect for

the last four years.  But "the States need not define injury with such a demanding level of particularity to establish standing," *Id.* at 564 (citing *Massachusetts v. EPA*, 549 U.S. at 523 n.21), and that does not change just because this case is before the Court on summary judgment. At this stage, the States need to present evidence in the record that their concern—that women who lose coverage (or who never receive it from their employer to begin with, when they would have done so pre-Final Rules) will turn to state-funded contraceptive programs—is concrete and imminent.  The States have done so: they point to Defendants' own admissions that such facts will occur.  82 Fed. Reg. at 47,803 (noting that "there are multiple Federal, State, and local programs that provide free or subsidized contraceptives for low-income women," and reasoning that women who lose contraception by virtue of the IFRs—and eventually the Final Rules—will turn to those methods instead).  And in any event, when plaintiffs seek forward-looking relief (such as vacatur) like the States do here, it is not dispositive whether the plaintiff has been harmed already (which is what Little Sisters faults the States for purportedly failing to prove); standing in cases requesting prospective relief requires a showing that the plaintiff faces imminent harm in the future.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).  As the Third Circuit determined, the record confirms that the effect of the Final Rules is to deprive women of insurance coverage for contraceptive methods and counseling, which in turn would cause them to rely on state programs.  *Pennsylvania III*, 930 F.3d at 562-64.  The States may continue to rely on that record—which, at the preliminary-injunction stage, contained (and still does contain)—evidence establishing injury.[14]  *See Pennsylvania I*, 281 F. Supp.3d at 567-68

---

[14] Little Sisters argues that the States have "sat on their heels . . . , content to let the Rules stay in effect while the agencies considered new rules."  That argument is belied by the record, which reflects that: (1) Defendants moved to stay this matter in light of the Biden Administration's representations that it was considering amending the Rules; (2) the States opposed said stay; (3) the Court granted the stay over the States objection; and, (4) throughout this litigation the States have "remain[ed] concerned about the ongoing harms" that the Final Rules were inflicting.

(citing to declarations that Pennsylvania will suffer financial harm by virtue of the Rules because women will turn to the States for contraception); *Pennsylvania II*, 351 F. Supp.3d at 807-08 (same); *Pennsylvania III*, 930 F.3d at 561-62.

Second, the States' financial injury is "fairly traceable" to the issuance of the Final Rules. By their terms, the Religious Exemption Rule expands the scope of exempted entities and the Moral Exemption Rule creates a new rationale for refusing to provide employees with contraceptive coverage: if the refusal is "based on sincerely held moral convictions." 83 Fed. Reg. at 57,593. Thus, the Final Rules allow more entities to stop providing contraceptive coverage, which will result in more women residents seeking contraceptive care through State-funded programs. The States have thus shown a causal connection between the Final Rules and their financial injury, and Little Sisters does not dispute as much in its briefing.

Finally, as the Court has previously explained, the States have satisfied the redressability requirement. Vacating the Rules "would prevent [the States'] injury altogether," *Texas v. United States*, 809 F.3d at 161, because it would return the state of women's coverage to the pre-Final Rules framework, meaning less women will be without contraceptive coverage, so fewer of them will have to turn to the States to provide that coverage.

Nevertheless, Little Sisters makes three arguments for why vacating the Rules would not redress the States' injury. First, Little Sisters argues that the States have only challenged the Final Rules, not the HRSA Guidelines themselves, and that the HRSA Guidelines separately provide for an exemption. So, the argument goes, because the Guidelines separately provide for a religious exemption, and the States only seek vacatur of the Final Rules, vacating the Rules would not make it so that more employers had to provide contraceptive coverage, because—independently—the Guidelines would allow the same expanded class of Religious and Moral

objectors that the Final Rules embraced to decline to provide coverage.

As a factual matter, that is incorrect—or at the very least, no longer correct.  In support of their contention that the Guidelines independently exempt religious objectors, Little Sisters points to a page of the joint appendix that appears to have been downloaded from the HRSA's website in October of 2020.  That page does purport to lay out the HRSA's Guidelines, and it does include identical language as the Final Rules detailing exemptions for religious and moral objectors.  But the Guidelines today do not contain such language.  *See* HRSA*, Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines (last visited August 12, 2025).  The Guidelines—as they currently stand—merely direct readers to the Final Rules to determine exemptions.  *See id.* ("With respect to religious and moral exemptions in connection with coverage of certain preventive health services, see 45 CFR 147.132 and 45 CFR 147.133.").  As such, if the Rules are vacated, the Guidelines would not continue to exempt the same class of religious and moral objections the Final Rules presently do.

Second, Little Sisters argues that courts have issued several injunctions preventing the enforcement of the Contraceptive Mandate against known religious objectors.[15]  To Little Sisters, the existence of these injunctions means that, even if the Rules are vacated, the States' injury will not be redressed, because women covered by those injunctions will still not have access to contraception.  That argument misses the self-professed point of the Rules, which was to expand the availability of religious exemptions beyond what federal courts had recognized at the time.  83 Fed. Reg. at 57,575-76 (stating that the "final rules will not affect whether" entities,

---

[15] In its briefing, Little Sisters does not cite directly to these injunctions.  Instead, it references prior briefing in which it collected such citations.  But citing to prior briefing is not condoned, because it has the capacity to "improperly circumvent[] ... page limits, unfairly prejudice[] the opposing parties, and tax[] the Court's resources." *Daugherty v. Adams*, 2019 WL 7987859, at *14 (W.D. Pa. Nov. 15, 0219); *see also Masimo Corp. v. Philips Elec. N.A. Corp.*, 62 F. Supp.3d 368, 376 (D. Del. 2014).

who had secured injunctions against the enforcement of the Mandate as to them, would "be subject to the contraceptive Mandate," and excluding employees of such entities from the Rule's regulatory impact analysis). It is the policyholders and entities who *were* lawfully subject to the Contraceptive Mandate—but who after the promulgation of the Final Rules were exempt—who will once again become subject to the Contraceptive Mandate should the Rules be vacated. That will remedy the issue raised by the States here; the employees of such entities will now receive contraceptive coverage rather than having to turn to the States.

Finally, Little Sisters presents a bevy of constitutional arguments for why the Contraceptive Mandate is unconstitutional, meaning (in its view) that the Mandate may not be enforced at all, so an order of this Court vacating the Rules would not allow any women to secure contraceptive coverage, because the Mandate would have to remain unenforced.

Those arguments fall well outside the scope of the matter before the Court and therefore need not be addressed. Recall that Little Sisters is an intervenor in this litigation. It is axiomatic that "[i]ntervenors may only argue issues that have been raised by the principal parties." *Nat'l Ass'n of Regul. Util. Comm'rs v. ICC*, 41 F.3d 721, 729 (D.C. Cir. 1994). Neither the States, nor Defendants, have challenged the Contraceptive Mandate, on the grounds raised by Little Sisters: To wit, that the Contraceptive Mandate runs afoul of (1) the non-delegation doctrine, *see Gundy v. United States*, 588 U.S. 128, 132 (2019); (2) the Appointments Clause, U.S. Const. Art. II, § 2, cl. 2; (3) the Free Exercise Clause of the First Amendment, U.S. Const. amend. I; and, (4) the ecclesiastical abstention doctrine (sometimes called the church-autonomy doctrine), *see Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 709-10 (1976). Given that neither party challenges the Contraceptive Mandate itself, Little Sisters may not raise these arguments solo. *See id.*

Indeed, the Third Circuit allowed Little Sisters to intervene because it sought "to defend only the portions of the religious exemption [rule] that appl[ies] to" it and "to seek the *same relief as the federal government*." *Pennsylvania v. President of the United States*, 888 F.3d at 57 n.2, 58 (emphasis added). But if Little Sisters is correct, if the United States Constitution "prohibits enforcement of the Mandate," then, taking Little Sisters at its word, it wishes the Court to enjoin Defendants from enforcing the Contraceptive Mandate—a request that the Plaintiffs in this litigation have not made.

### B. Arbitrary and Capricious Review

Having determined that the States have standing, the Court now turns to the substantive issues raised in the Parties' Cross-Motions for Summary Judgment.

The States argue that the promulgation of both the Religious and the Moral Rule was arbitrary and capricious under the APA. In reviewing agency action, the Court "shall . . . hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious if it:

> [1] relied on factors which Congress has not intended it to consider, [2] entirely failed to consider an important aspect of the problem, [3] offered an explanation for its decision that runs counter to the evidence before the agency, or [4] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Additionally, an agency action must be set aside as arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *Id.* at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). In evaluating whether an agency decision is arbitrary and capricious, the Court must review the agency's decision "solely [on] the

30

grounds invoked by the agency." *Sec. & Exch. Comm'n v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 196 (1947). The scope of review is narrow, and "a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43.

The States press a number of theories for why the Agencies' actions were arbitrary and capricious.

### i.    *The Agencies Did Not Provide a Satisfactory Explanation for the Religious Rule*

Turning first to the Religious Rule: For the reasons set forth below, the Agencies' actions in promulgating the Rule were arbitrary and capricious—in that they failed to "articulate a satisfactory explanation for [their] action[s] including a 'rational connection between the facts found and the choices made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).

### a.    The Religious Rule Does Not Reasonably Address the Problem it Purports to Resolve

The States argue that there is no rational connection between the problem the Agencies identified when they promulgated the Final Rules and the solution they chose. So, the Court must evaluate whether there "is a mismatch between the scope of the religious exemption and the problem the agencies set out to address." *Little Sisters*, 591 U.S. at 707 (Kagan, J. concurring in the judgment) (quoting *State Farm*, 463 U.S. at 43). If there is such a mismatch, the Religious Rule must be set aside. *See id.*

In promulgating the Religious Rule, the Agencies' justified the Rule by invoking potential conflicts between the Contraceptive Mandate and RFRA. 83 Fed. Reg. at 57,546-48 ("Requiring Entities To Choose Between Compliance With the Contraceptive Mandate or the Accommodation Violated RFRA in Many Instances"); *see also Little Sisters*, 591 U.S. at 680-83 (explaining that, in promulgating the Religious Rule, the Agencies reasoned that "RFRA

independently compelled" the Rule); *id.* at 710 (Kagan, J., concurring in the judgment) ("RFRA cast a long shadow over the Departments' rulemaking . . . .").[16]

The Agencies expressed reliance on RFRA warrants a dip into the reasons for that statute's passage. Congress enacted RFRA in 1993 in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990), in which the Supreme Court held that "the Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws," and thus strict scrutiny did not apply to Free Exercise challenges to laws of general applicability. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006). *Smith* upended decisions such as *Sherbert v. Verner*, 374 U.S. 398 (1963), which required courts to employ "a balancing test that took into account whether [a] challenged action imposed a substantial burden on the practice of religion, and if it did, whether it was needed to serve a compelling government interest," *Hobby Lobby*, 573 U.S. at 693. With RFRA, Congress sought to restore the pre-*Smith* judicial standard. *See* 42 U.S.C. § 2000bb(b)(1) (stating that a purpose of the statute is "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened"); *see also Gonzales*, 546 U.S. at 424, 430-31.

In accordance with this goal, RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of

---

[16] The Agencies did not justify the Moral Rule as compelled by RFRA; nor could they. RFRA protects a person's "exercise of religion," and does not speak to broader moral convictions. 42 U.S.C. § 2000bb-1(a).

furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). Accordingly, RFRA has two components. First, apart from the stated exception, the government is prohibited from placing a substantial burden on religious exercise. If government action does not impose a substantial burden on religion, then RFRA is not implicated. However, if it does, the government action must be struck down unless it is in furtherance of a compelling government interest and is the least restrictive means of furthering that interest.

The Religious Rule goes far "beyond what the Departments' justification" (*i.e.*, resolving potential conflicts between RFRA and the Contraceptive Mandate) "supported—raising doubts about whether the solution lacks a 'rational connection' to the problem described." *Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring in the judgment) (quoting *State Farm*, 463 U.S. at 43). Recall that, after *Hobby Lobby*, the Accommodation allowed most "employer[s]," other than publicly traded ones, who "object[ed] to the contraceptive mandate for religious reasons [to] avail [themselves] of the 'self-certification accommodation.'" *Id.* at 707 (citing *id.* at 668 (majority opinion)). The certification obviated the employers' obligations "to contract, arrange, [or] pay" for contraceptive coverage—just the insurers were required to pay for contraception. *Id.* (quoting 78 Fed. Reg. at 39,874). Although that resolved the conflict between RFRA and the Contraceptive Mandate that the Supreme Court recognized in *Hobby Lobby*, some organizations believed that that "the accommodation itself made them *complicit* in providing contraception," *id.* at 708 (emphasis added), by virtue of the employer being required to fill out a self-certification form. These objections are commonly called "complicity-based objections." *See id.* at 681-82 (majority opinion).

In *Wheaton College*, the Supreme Court evaluated such a complicity-based objection. There, it determined that the petitioners' objections to the self-certification form could be

accommodated by allowing the petitioner to simply notify the federal government of its objection, rather than filling out the self-certification form. 134 S.Ct. at 2807. And again, the Accommodation was expanded to include such an option. 79 Fed. Reg. at 51,094-96. However, certain organizations, such as Little Sisters, maintained that their complicity-based objections persisted—in their view, providing notice to the federal government was just as burdensome on their religious beliefs as filling out the self-certification form and sending it to their insurer, and both options substantially burdened their religious beliefs. That was the kind of objection that the Supreme Court was presented with in *Zubik*, but that it declined to evaluate. *Zubik*, 578 U.S. at 406-08 (*per curiam*).

If it had, and if it had found that the Accommodation (as expanded in light of *Hobby Lobby* and *Wheaton College*) still substantially burdened some entities' religious exercise, there were options other than the Religious Rule open to the Agencies. For example, "the Departments might have chosen to exempt the Little Sisters and other still-objecting groups from the mandate." *Little Sisters*, 591 U.S. at 708 (Kagan, J., concurring in the judgment). "But the Departments went further still." *Id.* Instead, the Religious Rule "exempt[s] *all* employers with objections to the mandate, even if the accommodation" as amended in light of *Hobby Lobby* and *Wheaton College* "met their religious needs." *Id.* In other words, the Religious Rule does not extend exemptions just to those who still maintained sincerely held, complicity-based objections to the Accommodation as it stood after *Hobby Lobby*, *Wheaton College*, and *Zubik*; it extends exemptions even to entities *without* such objections.[17]

---

[17] Little Sisters (but not Defendants) argues that the Religious Rule does *not* allow entities without objection to the Accommodation to take advantage of the exemption. In support of that argument, Little Sisters cites that the Final Rule's exemption only applies "to the extent that an entity . . . objects" to compliance. 45 C.F.R. § 147.132(a)(2). That ignores the fact that, under the Religious Rule, the Accommodation is a voluntary alternative to the exemption, 45 C.F.R. § 147.131(c)(2), and that no notice is required to take advantage of the exemption, so the practical outcome is that the exemption does not require anyone to affirmatively state an objection.

The Religious Rule also extends exemptions to organizations that are unlikely, if ever, to be capable of maintaining a religious objection, raising further doubts as to any "rational connection" between the Rule and remedying potential conflicts with RFRA.  *Id.* (quoting *State Farm*, 463 U.S. at 43).  In promulgating the Religious Rule, the Agencies argued that the reasoning of *Hobby Lobby* (which held that closely held corporations, not publicly traded ones, could maintain a religious objection for purposes of RFRA) extends to publicly traded corporations.  *See* 83 Fed. Reg. at 57,562.  But in *Hobby Lobby*, the Court explicitly declined to extend its holding to publicly traded corporations, suggesting that publicly traded corporations would be unlikely to hold a singular, sincere religious belief:

> [I]t *seems unlikely* that the sort of corporate giants to which HHS refers will often assert RFRA claims.  HHS has not pointed to any example of a publicly traded corporation asserting RFRA rights, and *numerous practical restraints would likely prevent that from occurring*.  For example, the idea that unrelated shareholders—including institutional investors with their own set of stakeholders—would agree to run a corporation under the same religious beliefs *seems improbable*.  In any event, we have no occasion in these cases to consider RFRA's applicability to such companies.

573 U.S. at 717 (emphases added).  So, the Defendants' assertion that *Hobby Lobby*'s reasoning can be extended to publicly traded companies is untenable when the language of *Hobby Lobby* was clear that public traded corporations are unlikely, if ever, able to maintain a religious objection.  *Id.*  Indeed, the Agencies recognized as much: in promulgating the Religious Rule, they stated that they "agree with the Supreme Court's statement in *Hobby Lobby* that it is unlikely that many" (or any, as implied by *Hobby Lobby*) "publicly traded companies will adopt religious objections to offering women contraceptive coverage."  83 Fed. Reg. at 57,562.  Thus, the Agencies are talking out of both sides of their mouth in extending a RFRA-motivated exemption to a class of entities they believed unlikely to ever pose a RFRA challenge—making

it a stretch at best to "draw a 'rational connection' between the problem [the Agencies] identified and the solution [they had] chosen," and revealing a "'clear error of judgment.'" *Little Sisters*, 591 U.S. at 707-08 (Kagan, J., concurring in the judgment) (quoting *State Farm*, 463 U.S. at 43).

To simultaneously hold two conflicting positions regarding the same issue is, at its core, arbitrary. Black's Law Dictionary 134 (3d ed. 1933) (defining arbitrary as "[n]ot governed by any fixed rules or standard"); Black's Law Dictionary (4th ed. 1951) (defining arbitrary as "without adequate determining principle" and "depending on the will alone"). In other words, it is logically inconsistent—arbitrary and not rational—to state that both "x is true" (by "agree[ing] with the Supreme Court's statement in *Hobby Lobby* that it is unlikely that many publicly traded companies will adopt religious objections," 83 Fed. Reg. at 57,562), while also stating that "x is not true" (by purportedly extending *Hobby Lobby*'s reasoning to include publicly traded corporations, *id.*).

The Religious Rule also provides no backstop to who can claim an exemption, unlike RFRA itself, again raising doubts about whether the Rule has a "rational connection" to addressing possible conflicts between RFRA and the Contraceptive Mandate. *Little Sisters*, 591 U.S. at 708 (Kagan, J., concurring in the judgment) (quoting *State Farm*, 463 U.S. at 43). In order to be entitled to an accommodation or exemption under RFRA, the religious objector must demonstrate that the government has "substantially burden[ed]" their exercise of religion. 42 U.S.C. § 2000bb-1(a). And Courts are required to assess whether those religious objections are "sincere." *See Hobby Lobby*, 573 U.S. at 717 n.28 ("To qualify for RFRA's protection, an asserted belief must be 'sincere': a corporation's pretextual assertion of a religious belief in order to obtain an exemption for financial reasons would fail."). But because the Religious Rule allows potential religious objectors to exempt themselves from the Contraceptive Mandate

without notifying anyone of their objection, there exists no mechanism for evaluating the

sincerity of the objector's religious beliefs, or whether complying with the Contraceptive

Mandate (or the Accommodation) substantially burdens the individual's religious exercise.  Yet

again, the categorical approach with which the Rule exempts religious objectors—when

compared to RFRA's careful evaluation of sincere beliefs and substantial burdens—casts doubt

on whether the Rule could merit a conclusion that there is a "'rational connection' between the

problem [the Agencies] identified and the solution [they had] chosen." *Little Sisters*, 591 U.S. at

707 (Kagan, J., concurring in the judgment) (quoting *State Farm*, 463 U.S. at 43).

Regardless, Defendants urge the Court to set aside any concerns about the over-

inclusiveness of the Religious Rule because "[a]n agency has wide discretion in making line-

drawing decisions" and "is not required to identify the optimal threshold with pinpoint

precision." *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214-15 (D.C. Cir. 2013).

Be that as it may, the Rule is not arbitrary and capricious because it draws imprecise lines.  It is

arbitrary and capricious because the Agencies identified a problem (RFRA violations) and then

proposed a solution that is not rationally connected to solving that problem (exempting

organizations whose compliance with the Accommodation posed no potential conflict with

RFRA to begin with).  That is a "clear error of judgment" that even the APA's deferential

standard of review cannot excuse.  *State Farm*, 463 U.S. at 44 (quoting *Bowman Transp. Inc. v.

Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

### b.  RFRA Does Not Compel the Religious Rule

In response to the above, Defendants and Little Sisters maintain that RFRA compelled

the Religious Rule—at least insofar as the Contraceptive Mandate implicated religious objectors

who maintained complicity-based objections to the Accommodation.  In their view, the

Accommodation still conflicted with RFRA, because some employers believed that even

notifying HHS of their objection to providing contraceptive coverage "ma[de] them complicit in providing [that] coverage." *Priests for Life v. HHS*, 808 F.3d 1, 15 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of rehearing *en banc*). But according to binding Third Circuit precedent, the Accommodation did not substantially burden religious exercise, so Defendants cannot invoke the statute here as forcing their hand.[18]

The Accommodation has been specifically upheld against a RFRA challenge by the Third Circuit, first, and directly, in a case called *Geneva College* and second, by implication, in another—*Real Alternatives*. *Geneva Coll. v. Sec'y U.S. Dep't of Health & Hum. Servs.*, 778 F.3d 422, 442 (3d Cir. 2015), *vacated and remanded sub nom. Zubik v. Burwell*, 578 U.S. 403 (2016) (per curiam); *see also Real Alts. v. Sec'y Dep't of Health & Hum. Servs.*, 867 F.3d 338, 356 n.18 (3d Cir. 2017). In *Geneva*, nonprofits eligible for the Accommodation asserted that filling out the self-certification form "facilitate[d]" or "trigger[ed]" the provision of contraceptives, thereby substantially burdening their religious exercise. 778 F.3d at 427. The Third Circuit determined, however, that the self-certification did not trigger or facilitate the provision of coverage—the Contraceptive Mandate did—and therefore, the self-certification process did not substantially burden the religious exercise of the plaintiffs there. *Id.* at 437-38. Further, "the submission of the self-certification form does not make" religious objectors "'complicit' in the provision of contraceptive coverage. If anything, because the" objectors "specifically state on the self-certification form that they *object* on religious grounds to providing such coverage, it is a declaration that they will *not be complicit* in providing coverage." *Id.* at 438-39.

---

[18] Of course, the Agencies were welcome to consider RFRA in promulgating the Religious Rule. *Little Sisters*, 591 U.S. at 682-83 (The States' "argument that the [Agencies] erred by looking to RFRA as a guide when framing the religious exemption is without merit."). But that does not mean that their conclusions about RFRA's scope are entitled to deference in the face of contradicting precedent. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 398-401 (2024).

Nevertheless, Defendants and Little Sisters argue that because *Geneva* was vacated by the Supreme Court in *Zubik*, it is not binding on this Court. But in *Zubik*, the Supreme Court specifically declined to decide the merits of a RFRA challenge to the Accommodation and refrained from "decid[ing] whether petitioners' religious exercise ha[d] been substantially burdened." 578 U.S. at 409. Indeed, although the Supreme Court vacated the "judgments of the Courts of Appeals," the Supreme "Court expresse[d] no view on the merits" of *Geneva*, or opinions from other Circuits. *Id.* at 409-10. And the Supreme Court remanded for the express purpose of allowing the parties "an opportunity to arrive at an approach going forward that accommodates petitioners' religious exercise *while at the same time ensuring that women covered by petitioners' health plans receive full and equal health coverage, including contraceptive coverage*." *Id.* at 409 (cleaned up) (emphasis added).

The argument that *Zubik*'s vacatur of *Geneva*'s judgment means that *Geneva*'s reasoning is in doubt was put to rest a year after the Supreme Court handed *Zubik* down, when the Third Circuit decided *Real Alternatives*, which embraced *Geneva*'s reasoning in its entirety. 867 F.3d at 356 n.18. There, the Third Circuit was clear:

> Although our judgment in *Geneva* was vacated by the Supreme Court, it nonetheless sets forth the view of our Court, which was based on Supreme Court precedent, that we continue to believe to be correct regarding our duty to assess substantiality as well as our conclusion that the regulation at issue there did not impose a substantial burden. *Cf. Zubik*, 136 S.Ct. at 1560 (specifying that vacatur and remand do not express the Supreme Court's "view on the merits" of *Geneva*). That judgment, and others cited here that addressed similar claims, was vacated because the Supreme Court wanted the parties to attempt—after the parties signaled they might be able—to develop a way for existing or modified ACA regulations to provide continued contraceptive coverage to petitioners' employees and through petitioners' insurers without any notice from petitioners. *Id*. Thus, *Zubik* vacated our judgment in *Geneva* but did not attack our reasoning. The Dissent mischaracterizes our holding today to be saying

> that *Geneva* is "controlling" for purposes of this case. Dissent Op. at 373–
> 74. That is not our position. While *Geneva* is no longer controlling, there
> is nothing that would require us—or anyone else—to conclude that our
> reasoning in that opinion was incorrect.

*Id.* Little Sisters latches on to the majority's statement that "*Geneva* is no longer controlling," *id.*, but that is a myopic and distorted reading of the majority opinion. The Third Circuit continued: *Geneva* "nonetheless sets for the view" of the Third Circuit, and "nothing," including *Zubik*, would "require . . . anyone . . . to conclude that [its] reasoning" in *Geneva* was incorrect. *Id.*

And indeed, in *Real Alternatives*, the Third Circuit reaffirmed and reapplied the reasoning of *Geneva*. In both cases, the Third Circuit found that there was no substantial burden on the plaintiffs' religious exercise because their actions were insufficiently related to the provision of contraceptives and "an independent obligation on a third party can[not] impose a substantial burden on the exercise of religion in violation of RFRA." *Id.* at 364 (quoting *Geneva*, 778 F.3d at 440-41).

Undeterred, Little Sisters launches a pair of attacks on *Real Alternatives* and *Geneva*, but neither are compelling. First, Little Sisters argues that *Geneva* "was procured on incorrect facts." The details of that argument need not be recapitulated here because, even assuming that assertion is true, it does not obviate the fact that *Real Alternatives* reaffirmed *Geneva*'s reasoning without reservation. *Id.* at 356 n.18.

And finally, Little Sisters argues that in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), the Supreme Court rejected *Real Alternatives*' and *Geneva*'s reasoning that the Accommodation does not burden religious exercise. But *Fulton* does not bear on *Real Alternatives* or *Geneva*, either on its facts or by its reasoning. There, "[t]he Philadelphia foster care system depend[ed] on cooperation between the City and private foster agencies," such as the

plaintiff, Catholic Social Services (CSS), which was a religious organization.  *Id.* at 526-29.
After it became apparent that CSS would not "certify" same-sex couples to become foster
families, "[t]he City stated that it would not enter a full foster care contract with CSS in the
future unless the agency agreed to" make such a certification.  *Id.* at 530-31.  Because
"certification" of same-sex couples to become foster families was, in CSS's view, "tantamount to
endorsement," the majority assumed that such certification burdened CSS's religious exercise.
*Id.* at 532-33.  The majority then went on to determine that said burden was not "neutral and
generally applicable," meaning it was subject to strict scrutiny.  *Id.* at 533.

As for *Fulton*'s reasoning, the majority never determined that such certification was a
*substantial* burden on CSS's religious exercise—so it never had the occasion to reject *Geneva*'s
or *Real Alternatives*' analysis.  Indeed, the only similarity between *Fulton*, *Real Alternatives* and
*Geneva* is that the cases involved the word "certification."  Little Sisters' seizes on that one
word, arguing that if a religious organization being required to "certify" same-sex couples as fit
to become foster parents is constitutionally suspect (as the Supreme Court majority held in
*Fulton*, 593 U.S. at 532-33), then so is requiring that organization to "certify" that it maintains an
objection to providing contraceptive coverage in order to take advantage of the Accommodation.
But in *Fulton*, the "certification" in question was "tantamount to endorsement."  *Id.* at 532.  Not
so in *Geneva*, *Real Alternatives*, nor here.  *Geneva*, 778 F.3d at 438-39 (noting that the
"submission of the self-certification form" is not an endorsement of contraception, but "a
declaration that [the religious objector] will *not be complicit* in providing coverage."); *Real
Alternatives*, 867 F.3d at 361 (holding that the Contraceptive Mandate and Accommodation
process does not "mandat[e] an endorsement" of contraception).  Accordingly, applying the law
of this Circuit as announced in *Geneva* and as reaffirmed by *Real Alternatives*, the

Accommodation did not impose a substantial burden on religious exercise; so, the Agencies cannot rely on RFRA as compelling the Religious Rule.

When an agency decision is "based on an erroneous interpretation of the law," such as whether RFRA compels the Religious Rule, that decision is "an abuse of discretion," and therefore in violation of 5 U.S.C. § 706(2)(A).  *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).  So, to the extent that the Agencies' reason for promulgating the Religious Exemption Rule was motivated by an erroneous conclusion that RFRA compelled as much, *see Little Sisters*, 591 U.S. at 710 ("RFRA cast a long shadow over the Departments' rulemaking . . . ."), that action must be "set aside."  5 U.S.C. § 706.

### ii.    The Agencies Considered Improper Factors in Promulgating the Moral Rule

Neither is the Moral Rule sustainable.  The States' point that, in promulgating the Moral Rule, the Agencies "relied on factors which Congress has not intended it to consider," *State Farm*, 463 U.S. at 43, is well made.  Accordingly, the Moral Rule must be set aside as arbitrary and capricious.  *Id.*

Although the Agencies were permitted to consider any potential impact by RFRA on the Religious Rule, *Little Sisters*, 591 U.S. at 680-81, "that statute does not apply to those with moral scruples," *Id.* at 710 (Kagan, J., concurring in the judgment).  Indeed, as Defendants do not dispute, nothing in the Affordable Care Act provides that the Agencies may consider moral objections in exercising their authority to create exemptions to the Contraceptive Mandate.

Nevertheless, as Defendants point out, Supreme Court guidance on whether the Women's Health Amendment contemplated the Agencies' considering moral objections is somewhat mixed.  In *Hobby Lobby*, the majority opinion explicitly differentiated between religious and moral objections.  Indeed, the majority opinion noted that Congress rejected an amendment to

the Women's Health Amendment which would have allowed for moral objections, because the text of the amendment would have "authorized a blanket exemption for religious *or* moral objectors; it would not have subjected religious-based objections to the judicial scrutiny called for by RFRA, in which a court must consider not only the burden of a requirement on religious adherents, but also the governments' interest and how narrowly tailored the requirement is." *Hobby Lobby*, 573 U.S. at 719 n.30. The majority thought it "perfectly reasonable to believe that the amendment was voted down because" such a carve out for moral objections would "extend[] more broadly than the pre-existing protections of RFRA." *Id.* But in *Little Sisters*, the majority opinion appeared to indicate the opposite view: "Under a plain reading of the statute, then, we conclude that the ACA gives HRSA broad discretion to define preventive care and screening and to create the religious and *moral* exemptions." 591 U.S. at 677 (emphasis added).

Even giving full weight to the Supreme Court majority's reference to the Moral Rule (that the Agencies were afforded "broad discretion to define preventive care and screening and to create the religious and *moral* exemptions," *id.* (emphasis added)) despite its analysis in *Hobby Lobby*, that reference is tangential to the question before the Court today, in that the Supreme Court was dealing with an entirely different question. Recall that, in *Little Sisters*, the question before the Supreme Court was not whether the Agencies acted arbitrarily or capriciously in promulgating the Final Rules (the question before this Court, here), it was whether the Agencies possessed statutory authority to create exemptions at all, *id.* at 675, and whether the Agencies complied with the APA's notice-and-comment requirement, *id.* at 683. The question here is distinct: whether, in "acting within [their] sphere of delegated authority," *id.* at 707 (Kagan, J., concurring in the judgment), the Agencies "relied on factors which Congress ha[d] not intended [them] to consider," *State Farm*, 463 U.S. at 43.

Defendants argue that because Congress has, in other areas, allowed for moral objections to regulatory frameworks it must have done so here as well. 83 Fed. Reg. at 57,598-600. For example, Congress provided for conscience-based exemptions in the abortion context. *See* 42 U.S.C. § 300a-7(b), (c)(1). But that Congress provided for moral objections in one context does not mean that they necessarily did so in another context, here, as the Defendants would have it, to the Contraceptive Mandate. The principle of *expressio unius est exclusio alterius* compels exactly the opposite conclusion. That principle commands that "[w]hen Congress provides exceptions in a statute . . . [t]he proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth." *United States v. Johnson*, 529 U.S. 53, 58 (2000). So, that Congress included such objections elsewhere (such as in the abortion context), but not within the Women's Health Amendment, must be taken to mean that Congress did not intend for an entity's moral scruples to be considered in providing preventive services to women. *Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("We have often noted that when 'Congress includes particular language in one section of a statute but omits it in another,'" courts "'presume' that Congress intended a difference in meaning." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (alterations omitted)). This principal carries particular force here, where—as articulated by the Supreme Court in *Hobby Lobby*—Congress rejected a change to the Women's Health Amendment which would have explicitly allowed for a consideration of moral objections. 573 U.S. at 719 n.30.

Defendants formulate a different reason why—in their view—Congress did not include moral scruples as a permissible factor to consider in promulgating exceptions to the Women's Health Amendment: to wit that Congress did not know that contraception would be included as a preventive service when it first passed the statute. *See* 83 Fed. Reg. at 57,599. Again, that

ignores what *Hobby Lobby* recognized: Even after the Guidelines contemplated contraceptive care, Congress decided not to amend the Women's Health Amendment to include a moral exemption, 573 U.S. at 719 n.30, further indicating that moral objections are "a factor[] which Congress [did] not intend for [the Agencies] to consider." *State Farm*, 463 U.S. at 43.

### *iii.    The Final Rules Were Insufficiently Reasoned*

Quite apart from the reasons set forth above, both the Religious and the Moral Rules must be vacated because the Agencies did not provide a "satisfactory explanation for [their] action," *State Farm*, 463 U.S. at 4, in that they failed to provide a satisfactory explanation for their change in course regarding contraception's safety and efficacy, and, they failed to adequately address reasonable alternatives to the Rules they crafted.

### a.    The Agencies Did Not Provide a Reasoned Explanation for their Reversal in Course

Before 2017, and as Defendants do not contest, the Agencies considered contraceptive methods and counseling services to be safe, effective, and beneficial. *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870, 39,872-73, 38,887 (July 2, 2013); 77 Fed. Reg. at 8,727-28. But in explaining their position for promulgating the Final Rules, the Agencies purported to recognize new-found doubts as to those conclusions. *See, e.g.*, 83 Fed. Reg. at 57,553-55. The States argue that said change in position renders the Rules arbitrary and capricious.

When an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy; or its prior policy has engendered serious reliance interests," the agency must provide "a more detailed justification." *Fox Television*, 556 U.S. at 515. "In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered

by the prior policy." *Id.* at 515-16. "It follows that an '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). And finally, if an agency's conclusions "run[] counter to the evidence before the agency," the agency's action is arbitrary and capricious. *State Farm*, 463 U.S. at 43.[19]

Defendants do not dispute that the pre-Final Rules Accommodation framework engendered serious reliance interests, nor that the Agencies changed their position as to contraceptive's efficacy and safety.[20] They do, however, argue that they have supplied the "more detailed justification" that such a change in position requires. *Fox Television*, 556 U.S. at 515. To determine whether the Agencies did so, an overview of each change is warranted.

First, in promulgating the Rules, the Agencies purported to identify some ambiguity about the safety of contraception. For example, the Agencies cited to studies which associate certain kinds of contraception with negative health outcomes, such as fatal pulmonary embolism or hypertension. 83 Fed. Reg. at 57,553. These studies, the Agencies wrote, raise "empirical questions" about the safety of contraception, generally, although the Agencies purportedly "take

---

[19] As an initial matter—Defendants argue that *Little Sisters* already held that the Agencies' "analysis" of their "changed position" was "lengthy," and therefore, not arbitrary and capricious. 591 U.S. at 673. But "page length is itself an entirely arbitrary metric by which to judge the quality of an agency rule." *Chamber of Com. of United States v. SEC*, 115 F.4th 740, 751 (6th Cir. 2024). And in any event, in the portion of *Little Sisters* to which Defendants cite, the Supreme Court was discussing the Agencies' change in position about whether RFRA conflicted with the self-certification process of the Accommodation, not their change in position regarding the effectiveness and safety of contraception. 591 U.S. at 673. *Little Sisters* has no bearing on the latter.

[20] Defendants do not, but Little Sisters does. In Little Sisters' view, declining to take a position on contraception's effectiveness (after previously determining that contraception is safe and effective) is not a change in position at all. Unorthodox as such an argument may be, it need not be seriously entertained, because it is belied by the Agencies'; acknowledgment of their change in position in promulgating the Rules. 83 Fed. Reg. at 57,555 ("[R]examination of the record . . . has reinforced the Departments' conclusion that significantly more uncertainty and ambiguity exists on . . . issues" like contraception's safety and effectiveness "*than the Departments previously acknowledged*." (emphasis added)).

[no] position on" those questions.  *Id.* at 57,555.  But most of the studies the Agencies cited to in justifying their change in position were published either before or during the years that the Agencies concluded that contraception was safe and effective, and the Agencies do not explain why these studies now compel a different conclusion about contraception's safety when they did not do so in previous years.  *Compare* 83 Fed. Reg. at 57,553 (citing studies indicating the side effects of contraception, nearly all of which were published before 2012), *with* 77 Fed. Reg. at 8,727 (determining, in 2012, that contraception was safe and effective).

Additionally, for the handful of studies that the Agencies pointed to in promulgating the Rules, the studies speak to specific contraceptive methods which may be unsafe for subsets of users, such as the risk of stroke and heart issues associated with hormonal contraception in women who smoke.  *Id.* at 57,553.  But, as the States point out, the Agencies never identified which of the eighteen FDA-approved methods are implicated by such safety concerns.  Nor did they explain why a conclusion that one contraception method may be less safe than previously thought for a subset of people would alter their previous determination regarding the safety of contraception generally.  83 Fed. Reg. at 57,555; 83 Fed. Reg. at 57,611.  Nevertheless, the Agencies purported to extrapolate from such studies, determining that "significantly more uncertainty and ambiguity exists" on the issues of contraceptives' safety, while simultaneously purporting to refrain from "tak[ing] a position" about those "empirical question[s]."  83 Fed. Reg. at 57,555.

Second, in promulgating the Final Rules, the Agencies switched their position as it regards contraception's effectiveness.  For example, the Agencies stated that "it is difficult to establish" whether access to contraception reduces teen or unwanted pregnancies.  83 Fed. Reg. at 57,554-55.  But in support of that proposition, the Agencies cited studies which provide that

multiple factors may prevent teen and unwanted pregnancies; they did not cite anything supporting the conclusion that contraception is ineffective in reducing said pregnancies.  *Id.* at 57,554.

And finally, throughout the discussion of contraception's safety and efficacy in the administrative record, the Agencies' introduced a more fundamental ambiguity: whether certain forms of contraception constitute "abortifacients."  *Id.*  Although the Agencies purportedly did "not take a position on the scientific, religious, or moral debate on" whether some kinds of contraception are abortifacients, *id.*, the Agencies indeed had previously taken the opposite view. 78 Fed. Reg. at 39,888.  Although the Agencies cite to religious beliefs as generating questions regarding the abortifacient status of some contraceptive methods, they never identified any factual evidence that drives their switch-in-position from the former conclusion to the latter ambiguity.

In short, the Agencies have failed to show the "more detailed justification" required when Agencies change their position about factual matters in the face of significant reliance interests. *Fox Television*, 556 U.S. at 515.  Indeed, in the face of prior, contradictory findings that contraception is safe and effective, and without evidence to refute said conclusions, the Agencies' change-in-position "runs counter to the evidence," and for that reason, too, the Rules are arbitrary and capricious.  *State Farm*, 463 U.S. at 43.

### b.  The Agencies Failed to Consider Regulatory Alternatives

The States argue that the Agencies' actions were also arbitrary and capricious because they failed to address glaringly obvious alternatives when they promulgated the Final Rules. *State Farm*, 463 U.S. at 46 (finding agency's failure to consider an airbag-only alternative to either the airbag and automatic seatbelt standard or no standard at all was arbitrary and capricious); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) ("Nor do we

uphold agency action if it fails to consider 'significant and viable and obvious alternatives.'"
(quoting *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013))).  In
support of their argument, the States advance a number of alternatives the most salient of which
is the option  of providing an avenue for individuals to still get contraceptive coverage even if
they are a member of an exempt plan.

Note that, in 2023, the Agencies proposed "an independent pathway through which
women enrolled in plans or coverage sponsored, arranged, or provided by objecting entities can
access contraceptive services at no cost"—a plan commonly called the Individual Contraceptive
Arrangement ("ICA").  88 Fed. Reg. at 7,243.  The ICA would make contraceptive coverage
available to women of exempt organizations "without the plan sponsor or issuer having to take
any action that would facilitate the coverage to which it objects," thereby avoiding any
complicity-based objections from employers.  *Id.*  And indeed, the Agencies were aware of such
an option long before issuing the Final Rules.  *See, e.g.*, *Univ. of Notre Dame v. Burwell*, 786
F.3d 606, 612 (7th Cir. 2015), (the University would have "no problem" with a system in which
"each of its female employers [and students] signed and mailed . . . a form saying 'I have
insurance through Notre Dame, but the university won't cover contraceptive services, so now
you must cover them'" to the relevant insurer or TPA), *cert. granted, judgment vacated*, 578
U.S. 969 (2016).

Yet, in promulgating the Final Rules, the Agencies failed to consider such an alternative,
let alone provide "a reasoned explanation for" rejecting it.  *City of Brookings Mun. Tel. Co. v.
FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987) (internal quotation omitted).

## IV.    REMEDY

Having determined that both the Religious and Moral Rule are arbitrary and capricious,

the Court now turns to the question of remedy.  Specifically, the States argue that the Rules must be vacated.

## A.  Vacatur is Appropriate

The APA provides that the "reviewing court shall . . . (2) hold unlawful and *set aside* agency action, findings, and conclusions found to be—(A) arbitrary [and] capricious."  5 U.S.C. § 706 (emphasis added).  "Ordinarily, reviewing courts have applied that provision by vacating invalid agency action and remanding the matter to the agency for further review."  *Comité de Apoyo a los Trabajardores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014) (citing *Abington Mem. Hosp. v. Heckler*, 750 F.2d 242, 244 (3d Cir. 1984)).  "[I]t is particularly appropriate to remand the case with a *vacatur*" in cases where the Court would otherwise "leave in place a rule that is causing the very adverse effect that" the agency "is charged with preventing, and [the Court] would be legally sanction[ing] an agency's disregard of its statutory or regulatory mandate."  *Id.* (internal quotation marks omitted).

### i.    *Vacatur is Authorized by the APA*

Defendants argue, however, that to vacate the Final Rules would be to expand the Court's powers beyond its traditional constitutional and equitable limitations.  Supreme Court guidance—albeit not from a majority—counsels against that conclusion.  Recently, in *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799 (2024), Justice Kavanaugh authored a concurrence addressing the propriety of vacatur.  There, the plaintiff, Corner Post, while not directly confined by the challenged regulation, could still "obtain relief . . . because the APA authorizes vacatur of agency rules."  *Id.* at 826 (Kavanaugh, J., concurring).

Justice Kavanaugh's concurrence addressed the question because, the federal government in *Corner Post*, just like Defendants today, advanced—as he put it—the "far-reaching

50

argument . . . that the APA's authorization to 'set aside' agency action . . . permits a court only to enjoin an agency from enforcing a rule against the plaintiff." *Id.* at 827.  In a cautionary shot across the bow, Justice Kavanaugh warned:

> The Government's position would revolutionize long-settled administrative law—shutting the door on entire classes of everyday administrative law cases.  The Government's newly minted position is both novel and wrong.  It "disregards a lot of history and a lot of law."  M. Sohoni, The Past and Future of Universal Vacatur, 133 Yale L. J. 2304, 2311 (2024).
>
> *The APA authorizes vacatur of agency rules . . . .*

*Id.* (emphasis added).  Indeed, Justice Kavanaugh continued: "The text and history of the APA authorize vacatur . . . .  When Congress enacted the APA in 1946, the phrase 'set aside' meant 'cancel, annul, or revoke.'"  *Id.* at 829 (citing Black's Law Dictionary 1612 (3d ed. 1933); Black's Law Dictionary 1537 (4th ed. 1951) (same); Bouvier's Law Dictionary 1103 (W. Baldwin ed. 1926)).  And, at around the period when the APA was enacted, "it was common for an appellate court that reversed the decision of a lower court to direct that the lower court's 'judgment' be 'set aside,' meaning vacated."  *Id.* at 829-30 (internal citations omitted).  "The APA incorporated that common and contemporaneous meaning of 'set aside.'"  *Id.* at 830.  The APA makes no distinction between setting aside rules or other agency actions—"and because federal courts must 'set aside' agency rules in the same way" as other agency actions, "[i]n short, to 'set aside' a rule is to vacate it."  *Id.*  "Longstanding precedent," including the Supreme "Court . . . affirm[ing] countless decisions that vacated agency actions, including agency rules," confirmed that conclusion.  *Id.* at 830-31 (collecting cases).

Undeterred, Defendants attempt to analogize vacatur to universal injunctions, which the Supreme Court has recently held exceeds the scope of powers that Congress has bestowed upon the federal courts.  *Trump v. CASA, Inc.*, 606 U.S. __, 145 S. Ct. 2540, 2550 & n.4 (2025).  But

in removing universal injunctions from the federal courts' toolkit, the majority opinion made

clear that the "question whether the Administrative Procedure Act authorizes federal courts to

vacate federal agency action" was not implicated. *Id.* at 2554 n.10; *see also id.* at 2567

(Kavanaugh, J., concurring). And in any event, "in the APA, Congress did in fact . . . authorize

vacatur," by not just allowing, but *directing* courts to "set aside" arbitrary and capricious agency

action. *Corner Post*, 603 U.S. at 838 (Kavanaugh, J. concurring).

### ii.    *Remand Without Vacatur Is Not Appropriate*

Nevertheless, Defendants argue that two Third Circuit cases counsel that this Court

remand the Rules to the Agencies without vacatur. First, Defendants cite to *Coinbase, Inc. v.*

*SEC*, 126 F.4th 175 (3d Cir. 2025), where the Court of Appeals declined to vacate an SEC order,

instead remanding the order to the agency for "further explanation." *Id.* at 203. In that case, as

distinct from this one, the agency had explicitly decided (in the form of an order) *not* to engage

in rulemaking, and plaintiffs brought suit challenging that decision. *Id.* at 186-87, 203. Plaintiffs

requested that the Third Circuit require the SEC to proceed directly to rulemaking. *Id.* at 203.

The Third Circuit found that the SEC's decision not to make rules was arbitrary and capricious.

*Id.* But it declined to vacate the SEC's order deciding as much, because requiring the agency to

engage in rulemaking would be an "extraordinary remedy." *Id.* Here, the Agencies did engage

in rule-making, but they did so arbitrarily and capriciously, so *Coinbase* is distinguishable. Here,

"it is particularly appropriate to remand the case with a vacatur because if [the Court] did not do

so, [it] would leave in place a rule that is causing the very adverse effect that [the Agencies are]

charged with preventing" by the Women's Health Amendment, a lack of preventive services.

*Comité de Apoyo a los Trabajardores Agricolas*, 774 F.3d at 191.

Neither does a second Third Circuit case cited by Defendants, *Prometheus Radio Project*

*v. FCC*, 824 F.3d 33 (3d Cir. 2016), support their position.  In *Prometheus*, the Third Circuit

declined to order "mass vacatur" of a collection of FCC rules—at least one of which had been in

place for over forty years.  *Id.* at 50-53.  There, as opposed to here, the FCC had failed to fulfill

its statutory duty to "review" and revise "its rules on broadcast ownership every four years."  *Id.*

at 50-51.  The party challenging the rules requested vacatur "not" based on "the content of the

rules, but rather . . . the consequence of the [FCC's] delay."  *Id.* at 51.  The Court of Appeals

determined that the undue "delay" was unlawful, but declined to vacate the rules, because the

challengers were "not complaining of improper agency *action*; rather, their problem [was] with

agency *delay*."  *Id.* at 52.  In contrast, however, elsewhere during that litigation, the Third Circuit

did vacate various challenged regulations for failure to comply with the APA's strictures, *id.* at

60 (vacating one of the challenged rules for being "procedurally invalid") (citing *Prometheus*

*Radio Project v. FCC*, 652 F.3d 431, 453 (3d Cir. 2011) (doing the same)), which is the

"ordinar[y]" remedy when a "reviewing court[]" determines an "agency action" to be "invalid"

under the APA.  *Comité de Apoyo a los Trabajardores Agricolas*, 774 F.3d at 191 (citing

*Abington Mem. Hosp.*, 750 F.2d at 244).

### B.  The Rules Cannot Be Severed

Finally, Defendants invoke the severability clause in the Final Rules, which provides, in

pertinent part:

> Any provision of this section held to be invalid, or as applied to any person
> or circumstance, shall be construed so as to continue to give maximum
> effect to the provision permitted by law, unless such holding shall be one
> of utter invalidity or unenforceability, in which event ethe provision shall
> be severable form this section and shall not affect the remainder thereof or
> the application of the provision to persons not similarly situation or to
> dissimilar circumstance.

83 Fed. Reg at 57,589; *see also id.* at 57,624.  Based on that clause—Defendants argue—any

relief should only be applied as to specific portions of the Rules that injure the States.  "But 'the ultimate determination of severability will rarely turn on the presence or absence' of a severability clause."  *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022) (quoting *Cmty. For Creative Non-Violence v. Turner*, 893 F.2d 1387, 13947 (D.C. Cir. 1990)).  A court "will 'sever'" and leave in place "'a portion of an administrative regulation' only when [it] can say without any 'substantial doubt that the agency would have adopted the severed portion on its own.'"  *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 71 (D.C. Cir. 2017) (quoting *New Jersey v. EPA*, 517 F.3d 574, 584 (D.C. Cir. 2008)) (cleaned up), *decision modified on reh'g*, 883 F.3d 918 (D.C. Cir. 2018).  When provisions of a regulation operate "entirely independently of one another," severance may be appropriate.  *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d 1454, 1459 (D.C. Cir. 1997).

That is not the case here.  The Agencies have shown no adequate justification for either the Religious Rule or the Moral Rule, and even if they had, they "failed to draw a 'rational connection' between the problem [they] identified and the solution" they chose.  *Little Sisters*, 591 U.S. at 707 (Kagan, J., concurring in the judgment) (quoting *State Farm*, 463 U.S. at 43).  The Agencies failed to consider significant and obvious alternatives, *State Farm*, 463 U.S. at 51, and failed to justify their change in position from their previous understanding that contraception is safe and effective, *Fox Television*, 556 U.S. at 515.  Indeed, the Agencies' latter conclusion—that contraception's safety and effectiveness is suspect—ran counter to the evidence in front of the Agencies and to their prior findings made.  *State Farm*, 463 U.S. at 43.

These flaws go to the very heart of the Agencies' rational for rulemaking in the first instance—they do not go to any particular provision which might operate "entirely independently" of another.  *Davis Cnty. Solid Waste Mgmt. v. EPA*, 108 F.3d at 1459.  And

indeed, Defendants make no effort to spell out in their brief how some provisions of the Rules may operate independently of each other.  As such, the Rules shall be vacated in their entirety.

     An appropriate order follows.


**BY THE COURT:**

**S/ WENDY BEETLESTONE**

**_____**
**WENDY BEETLESTONE, C.J.**